## LOCAL 28 OF THE SHEET METAL WORKERS' INTER-NATIONAL ASSOCIATION ET AL. *v.* EQUAL EMPLOYMENT OPPORTUNITY COMMISSION ET AL.

No. 84–1656.   Argued February 25, 1986—Decided July 2, 1986

422

BRENNAN, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II, III, and VI, in which MAR-SHALL, BLACKMUN, POWELL, and STEVENS, JJ., joined, and in Parts II-A, III, and VI of which O'CONNOR, J., joined, and an opinion with respect to Parts IV, V, and VII, in which MARSHALL, BLACKMUN, and STE-VENS, JJ., joined. POWELL, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 483. O'CONNOR, J., filed an opinion concurring in part and dissenting in part, *post*, p. 489. WHITE, J., filed a dissenting opinion, *post*, p. 499. REHNQUIST, J., filed a dissenting opinion, in which BURGER, C. J., joined, *post*, p. 500.

*Martin R. Gold* argued the cause for petitioners. With him on the briefs were *Robert P. Mulvey* and *William Rothberg.*

*O. Peter Sherwood,* Deputy Solicitor General of New York, argued the cause for respondents. With him on the brief for respondent New York State Division of Human Rights were *Robert Abrams,* Attorney General, *Robert Hermann,* Solicitor General, and *Lawrence S. Kahn, Colvin W. Grannum, Jane Levine,* and *Martha J. Olson,* Assistant Attorneys General. *Solicitor General Fried, Assistant Attorney General Reynolds, Deputy Solicitor General Kuhl, Samuel A. Alito, Jr., Brian K. Landsberg, Dennis J. Dimsey, David K. Flynn,* and *Johnny J. Butler* filed briefs for respondent Equal Employment Opportunity Commission. *Frederick A. O. Schwarz, Jr., Leonard Koerner, Stephen J. McGrath, Lorna B. Goodman,* and *Lin B. Saberski* filed a brief for respondent city of New York.*

---

*Briefs of *amici curiae* urging reversal were filed for Local 542, International Union of Operating Engineers, et al. by *Robert M. Weinberg, Michael H. Gottesman, Jeremiah A. Collins, Edward D. Foy, Jr.,* and *George H. Cohen;* and for the Pacific Legal Foundation by *Ronald A. Zumbrun* and *John H. Findley.*

Briefs of *amici curiae* urging affirmance were filed for the State of California et al. by *John K. Van de Kamp,* Attorney General of California, *Andrea Sheridan Ordin,* Chief Assistant Attorney General, *Marian M. Johnston,* Deputy Attorney General, *William J. Guste, Jr.,* Attorney General of Louisiana, *Frank J. Kelley,* Attorney General of Michigan, *Hubert H. Humphrey III,* Attorney General of Minnesota, *Robert M. Spire,* Attorney General of Nebraska, *W. Cary Edwards,* Attorney General of New Jersey, *Paul Bardacke,* Attorney General of New Mexico, *David Frohnmayer,* Attorney General of Oregon, *Charles G. Brown,* Attorney General of West Virginia, *Bronson C. La Follette,* Attorney General of Wisconsin, and *Elisabeth S. Shuster;* for the city of Birmingham, Alabama, by *James P. Alexander, Linda A. Friedman,* and *James K. Baker;* for the city of Detroit et al. by *Daniel B. Edelman, John H. Suda, Charles L. Reischel, Frederick N. Merkin,* and *Robert Cramer;* for the Lawyers' Committee for Civil Rights Under Law et al. by *Paul C. Saunders, Harold R. Tyler, James Robertson, Norman Redlich, William L. Robinson, Richard T. Seymour, Grover G. Hankins, Charles E. Carter, E. Richard Larson,* and

JUSTICE BRENNAN announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II, III, and VI, and an opinion with respect to Parts IV, V, and VII in which JUSTICE MARSHALL, JUSTICE BLACKMUN, and JUSTICE STEVENS join.

In 1975, petitioners were found guilty of engaging in a pattern and practice of discrimination against black and Hispanic individuals (nonwhites) in violation of Title VII of the Civil Rights Act of 1964, 42 U. S. C. § 2000e *et seq.*, and ordered to end their discriminatory practices, and to admit a certain percentage of nonwhites to union membership by July 1981. In 1982 and again in 1983, petitioners were found guilty of civil contempt for disobeying the District Court's earlier orders. They now challenge the District Court's contempt finding, and also the remedies the court ordered both for the Title VII violation and for contempt. Principally, the issue presented is whether the remedial provision of Title VII, see 42 U. S. C. § 2000e–5(g), empowers a district court to order race-conscious relief that may benefit individuals who are not identified victims of unlawful discrimination.

I

Petitioner Local 28 of the Sheet Metal Workers' International Association (Local 28) represents sheet metal workers

*Burt Neuborne;* for the NAACP Legal Defense and Educational Fund, Inc., et al. by *Julius L. Chambers, Ronald L. Ellis, Clyde E. Murphy, Eric Schnapper, Samuel Rabinove, Richard T. Foltin, Theodore R. Mann, Marvin E. Frankel, Grover G. Hankins, Antonia Hernandez, Kenneth Kimerling,* and *David Saperstein;* for the National Conference of Black Mayors, Inc., by *Conrad K. Harper;* for the NOW Legal Defense and Education Fund et al. by *Marsha Levick* and *Emily J. Spitzer;* and for the North Carolina Association of Black Lawyers by *Joseph A. Broderick, Wayne Alexander, G. K. Butterfield, James E. Ferguson II, John H. Harmon, William A. Marsh, Jr., Brenda F. McGhee,* and *Floyd B. McKissick, Sr.*

Briefs of *amici curiae* were filed for the Equal Employment Advisory Council by *Robert E. Williams, Douglas S. McDowell,* and *Thomas R. Bagby;* and for the National Association of Manufacturers by *Dennis H. Vaughn, John C. Fox, Paul Grossman,* and *Jan S. Amundson.*

employed by contractors in the New York City metropolitan area. Petitioner Local 28 Joint Apprenticeship Committee (JAC) is a management-labor committee which operates a 4-year apprenticeship training program designed to teach sheet metal skills. Apprentices enrolled in the program receive training both from classes and from on-the-job work experience. Upon completing the program, apprentices become journeyman members of Local 28. Successful completion of the program is the principal means of attaining union membership.[1]

In 1964, the New York State Commission for Human Rights determined that petitioners had excluded blacks from the union and the apprenticeship program in violation of state law. The State Commission found, among other things, that Local 28 had never had any black members or apprentices, and that "admission to apprenticeship is conducted largely on a nepot[is]tic basis involving sponsorship by incumbent union members," App. JA–407, creating an impenetrable barrier for nonwhite applicants.[2] Petitioners were ordered to "cease and desist" their racially discriminatory practices. The New York State Supreme Court affirmed the State Commission's findings, and directed petitioners to implement objective standards for selecting apprentices. *State Comm'n for Human Rights* v. *Farrell*, 43 Misc. 2d 958, 252 N. Y. S. 2d 649 (1964).

---

[1] In addition to completing the apprenticeship program, an individual can gain membership in Local 28 by (1) transferring directly from a "sister" union; (2) passing a battery of journeyman level tests administered by the union; and (3) gaining admission at the time a nonunion sheet metal shop is organized by Local 28. In addition, during periods of full employment, Local 28 issues temporary work permits which allow nonmembers to work within its jurisdiction.

[2] The Sheet Metal Workers' International Union was formed in 1888, under a Constitution which provided for the establishment of "white local unions" and relegated blacks to membership in subordinate locals. Local 28 was established in 1913 as a "white local union." Although racial restrictions were formally deleted from the International Constitution in 1946, Local 28 refused to admit blacks until 1969.

When the court's orders proved ineffective, the State Commission commenced other state-court proceedings in an effort to end petitioners' discriminatory practices. Petitioners had originally agreed to indenture two successive classes of apprentices using nondiscriminatory selection procedures, but stopped processing applications for the second apprentice class, thus requiring that the State Commission seek a court order requiring petitioners to indenture the apprentices. *State Comm'n for Human Rights* v. *Farrell*, 47 Misc. 2d 244, 262 N. Y. S. 2d 526, aff'd, 24 App. Div. 2d 128, 264 N. Y. S. 2d 489 (1st Dept. 1965). The court subsequently denied the union's request to reduce the size of the second apprentice class, and chastised the union for refusing "except for token gestures, to further the integration process." *State Comm'n for Human Rights* v. *Farrell*, 47 Misc. 2d 799, 800, 263 N. Y. S. 2d 250, 252 (1965). Petitioners proceeded to disregard the results of the selection test for a third apprentice class on the ground that nonwhites had received "unfair tutoring" and had passed in unreasonably high numbers. The state court ordered petitioners to indenture the apprentices based on the examination results. *State Comm'n for Human Rights* v. *Farrell*, 52 Misc. 2d 936, 277 N. Y. S. 2d 287, aff'd, 27 App. Div. 2d 327, 278 N. Y. S. 2d 982 (1st Dept.), aff'd, 19 N. Y. 2d 974, 228 N. E. 2d 691 (1967).

In 1971, the United States initiated this action under Title VII and Executive Order No. 11246, 3 CFR 339 (1964–1965 Comp.) to enjoin petitioners from engaging in a pattern and practice of discrimination against black and Hispanic individuals (nonwhites).[3] The New York City Commission on Human Rights (City) intervened as plaintiff to press claims

---

[3] The Equal Employment Opportunity Commission (EEOC) was substituted as named plaintiff in this case. The Sheet Metal and Air Conditioning Contractors' Association of New York City (Contractors' Association) was also named as a defendant. The New York State Division of Human Rights (State), although joined as a third- and fourth-party defendant in this action, realigned itself as a plaintiff.

that petitioners had violated municipal fair employment laws, and had frustrated the City's efforts to increase job opportunities for minorities in the construction industry. *United States* v. *Local 638, Enterprise Assn. of Steam, Hot Water, Hydraulic Sprinkler, Pneumatic Tube, Compressed Air, Ice Machine, Air Conditioning, and General Pipefitters*, 347 F. Supp. 164 (SDNY 1972). In 1970, the City had adopted a plan requiring contractors on its projects to employ one minority trainee for every four journeyman union members. Local 28 was the only construction local which refused to comply voluntarily with the plan. In early 1974, the City attempted to assign six minority trainees to sheet metal contractors working on municipal construction projects. After Local 28 members stopped work on the projects, the District Court directed the JAC to admit the six trainees into the apprenticeship program, and enjoined Local 28 from causing any work stoppage at the affected job sites. The parties subsequently agreed to a consent order that required the JAC to admit up to 40 minorities into the apprenticeship program by September 1974. The JAC stalled compliance with the consent order, and only completed the indenture process under threat of contempt.

Following a trial in 1975, the District Court concluded that petitioners had violated both Title VII and New York law by discriminating against nonwhite workers in recruitment, selection, training, and admission to the union. *EEOC* v. *Local 638*, 401 F. Supp. 467 (SDNY 1975). Noting that as of July 1, 1974, only 3.19% of the union's total membership, including apprentices and journeymen, was nonwhite, the court found that petitioners had denied qualified nonwhites access to union membership through a variety of discriminatory practices. First, the court found that petitioners had adopted discriminatory procedures and standards for admission into the apprenticeship program. The court examined some of the factors used to select apprentices, including the entrance examination and high-school diploma requirement,

and determined that these criteria had an adverse discriminatory impact on nonwhites, and were not related to job performance. The court also observed that petitioners had used union funds to subsidize special training sessions for friends and relatives of union members taking the apprenticeship examination.[4]

Second, the court determined that Local 28 had restricted the size of its membership in order to deny access to nonwhites. The court found that Local 28 had refused to administer yearly journeyman examinations despite a growing demand for members' services.[5] Rather, to meet this increase in demand, Local 28 recalled pensioners who obtained doctors' certificates that they were able to work, and issued hundreds of temporary work permits to nonmembers; only one of these permits was issued to a nonwhite. Moreover, the court found that "despite the fact that Local 28 saw fit to request [temporary workers] from sister locals all across the country, as well as from allied New York construction unions such as plumbers, carpenters, and iron workers, it never once sought them from Sheet Metal Local 400," a New York City union comprised almost entirely of nonwhites. *Id.*, at 485. The court concluded that by using the temporary permit system rather than continuing to administer journey-

---

[4] The court also noted that petitioners' failure to comply with EEOC regulations requiring them to keep records of each applicant's race had made it difficult for the court to evaluate the discriminatory impact of petitioners' selection procedures.

[5] The court noted that Local 28 had offered journeyman examinations in 1968 and 1969 as a result of arbitration proceedings initiated by the Contractors' Association to force Local 28 to increase its manpower. Only 24 of 330 individuals, all of them white, passed the first examination and were admitted to the union. The court found that this examination had an adverse impact on nonwhites and had not been validated in accordance with EEOC guidelines, and was therefore violative of Title VII. Some nonwhites did pass the second examination, and the court concluded that Local 28's failure to keep records of the number of whites and nonwhites tested made it impossible to determine whether that test had also had an adverse impact on nonwhites.

man tests, Local 28 successfully restricted the size of its membership with the "illegal effect, if not the intention, of denying nonwhites access to employment opportunities in the industry." *Ibid.*

Third, the District Court determined that Local 28 had selectively organized nonunion sheet metal shops with few, if any, minority employees, and admitted to membership only white employees from those shops. The court found that "[p]rior to 1973 no non-white ever became a member of Local 28 through the organization of a non-union shop." *Ibid.* The court also found that, despite insistent pressure from both the International Union and local contractors, Local 28 had stubbornly refused to organize sheet metal workers in the local blowpipe industry because a large percentage of such workers were nonwhite.

Finally, the court found that Local 28 had discriminated in favor of white applicants seeking to transfer from sister locals. The court noted that from 1967 through 1972, Local 28 had accepted 57 transfers from sister locals, all of them white, and that it was only after this litigation had commenced that Local 28 accepted its first nonwhite transfers, two journeymen from Local 400. The court also found that on one occasion, the union's president had incorrectly told nonwhite Local 400 members that they were not eligible for transfer.

The District Court entered an order and judgment (O & J) enjoining petitioners from discriminating against nonwhites, and enjoining the specific practices the court had found to be discriminatory. Recognizing that "the record in both state and federal court against these defendants is replete with instances of . . . bad faith attempts to prevent or delay affirmative action," *id.*, at 488,[6] the court concluded that "the

---

[6] The court remarked:

"After [State] Justice Markowitz [in the 1964 state-court proceeding] ordered implementation of [a plan intended to] create a 'truly nondiscriminatory union[,]' Local 28 flouted the court's mandate by expending union

imposition of a remedial racial goal in conjunction with an admission preference in favor of non-whites is essential to place the defendants in a position of compliance with [Title VII]." *Ibid.* The court established a 29% nonwhite membership goal, based on the percentage of nonwhites in the relevant labor pool in New York City, for the union to achieve by July 1, 1981. The parties were ordered to devise and to implement recruitment and admission procedures designed to achieve this goal under the supervision of a court-appointed administrator.[7]

The administrator proposed, and the court adopted, an Affirmative Action Program which, among other things, required petitioners to offer annual, nondiscriminatory journeyman and apprentice examinations, select members according to a white-nonwhite ratio to be negotiated by the parties, conduct extensive recruitment and publicity campaigns aimed at minorities,[8] secure the administrator's consent before issuing temporary work permits, and maintain

funds to subsidize special training sessions designed to give union members' friends and relatives a competitive edge in taking the [apprenticeship examination]. JAC obtained an exemption from state affirmative action regulations directed towards the administration of apprentice programs on the ground that its program was operating pursuant to court order; yet Justice Markowitz had specifically provided that all such subsequent regulations, to the extent not inconsistent with his order, were to be incorporated therein and applied to JAC's program. More recently, the defendants unilaterally suspended court-ordered time tables for admission of forty non-whites to the apprentice program pending trial of this action, only completing the admission process under threat of contempt citations." 401 F. Supp., at 488.

[7] The O & J also awarded backpay to those nonwhites who could demonstrate that they were discriminatorily excluded from union membership.

[8] The District Court had concluded that petitioners had earned a well-deserved reputation for discriminating against nonwhites, and that this reputation "operated and still operates to discourage non-whites seeking membership in the local union or its apprenticeship program." *Id.*, at 487. The publicity campaign was consequently designed to dispel this reputation, and to encourage nonwhites to take advantage of opportunities for union membership.

detailed membership records, including separate records for whites and nonwhites. *EEOC* v. *Local 638*, 421 F. Supp. 603 (1975). Local 28 was permitted to extend any of the benefits of the program to whites and other minorities, provided that this did not interfere with the programs' operation.

The Court of Appeals for the Second Circuit affirmed the District Court's determination of liability, finding that petitioners had "consistently and egregiously violated Title VII." *EEOC* v. *Local 638*, 532 F. 2d 821, 825 (1976). The court upheld the 29% nonwhite membership goal as a temporary remedy, justified by a "long and persistent pattern of discrimination," *id.*, at 830, and concluded that the appointment of an administrator with broad powers was clearly appropriate, given petitioners' refusal to change their membership practices in the face of prior state and federal court orders. However, the court modified the District Court's order to permit the use of a white-nonwhite ratio for the apprenticeship program only pending implementation of valid, job-related entrance tests. Local 28 did not seek certiorari in this Court to review the Court of Appeals' judgment.

On remand, the District Court adopted a Revised Affirmative Action Program and Order (RAAPO) to incorporate the Court of Appeals' mandate. RAAPO also modified the original Affirmative Action Program to accommodate petitioners' claim that economic problems facing the construction industry had made it difficult for them to comply with the court's orders. Petitioners were given an additional year to meet the 29% membership goal. RAAPO also established interim membership goals designed to "afford the parties and the Administrator with some device to measure progress so that, if warranted, other provisions of the program could be modified to reflect change *[sic]* circumstances." App. JA–168. The JAC was directed to indenture at least 36 apprentices by February 1977, and to determine the size of future ap-

prenticeship classes subject to review by the administrator.[9] A divided panel of the Court of Appeals affirmed RAAPO in its entirety, including the 29% nonwhite membership goal. *EEOC* v. *Local 638*, 565 F. 2d 31 (1977). Petitioners again chose not seek certiorari from this Court to review the Court of Appeals' judgment.

In April 1982, the City and State moved in the District Court for an order holding petitioners in contempt.[10] They alleged that petitioners had not achieved RAAPO's 29% nonwhite membership goal, and that this failure was due to petitioners' numerous violations of the O&J, RAAPO, and orders of the administrator. The District Court, after receiving detailed evidence of how the O&J and RAAPO had operated over the previous six years, held petitioners in civil contempt. The court did not rest its contempt finding on petitioners' failure to meet the 29% membership goal, although nonwhite membership in Local 28 was only 10.8% at the time of the hearing. Instead, the court found that petitioners had "failed to comply with RAAPO . . . almost from its date of entry," App. to Pet. for Cert. A–156, identifying six "separate actions or omissions on the part of the defendants [that] have impeded the entry of non-whites into Local 28 in contravention of the prior orders of this court." *Id.*, at A–150. Specifically, the court determined that petitioners had (1) adopted a policy of underutilizing the apprenticeship program in order to limit nonwhite membership and employment

[9] The Affirmative Action Program originally had required the JAC to indenture at least 300 apprentices by July 1, 1976, and at least 200 apprentices in each year thereafter, up to and including 1981. These figures were adjusted downward after petitioners complained that economic conditions made it impossible for them to indenture this number of apprentices. The District Court also permitted petitioners to defer administration of the journeyman examination for the same reason.

[10] The Contractors' Association and individual Local 28 contractors were also named as respondents to the contempt proceeding.

opportunities;[11] (2) refused to conduct the general publicity campaign required by the O & J and RAAPO to inform nonwhites of membership opportunities; (3) added a job protection provision to the union's collective-bargaining agreement that favored older workers and discriminated against nonwhites (older workers provision); (4) issued unauthorized work permits to white workers from sister locals; and (5) failed to maintain and submit records and reports required by RAAPO, the O & J, and the administrator, thus making it difficult to monitor petitioners' compliance with the court's orders.

To remedy petitioners' contempt, the court imposed a $150,000 fine to be placed in a fund designed to increase nonwhite membership in the apprenticeship program and the union. The administrator was directed to propose a plan for utilizing the fund. The court deferred imposition of further coercive fines pending receipt of the administrator's recommendations for modifications to RAAPO.[12]

In 1983, the City brought a second contempt proceeding before the administrator, charging petitioners with additional violations of the O & J, RAAPO, and various adminis-

---

[11] The court explained that the "journeymen benefiting from this policy of underutilizing the apprenticeship program comprise Local 28's white incumbent membership." App. to Pet. for Cert. A–151. The court rejected Local 28's contention that any underutilization of the apprenticeship program could be blamed on difficult economic circumstances, emphasizing that the court had "not overlooked the obstacles or problems with which [petitioners] have had to contend," and that it had "given much consideration to the economic condition of the sheet metal trade in particular and the construction industry in general over the past six years." *Id.*, at A–156.

[12] The District Court found it necessary to modify RAAPO in light of the fact that the 29% nonwhite membership goal was no longer viable on the present timetable, and also because five other locals with predominantly white memberships had recently merged with Local 28. The court denied petitioners' cross-motion for an order terminating both the O & J and RAAPO, finding that these orders had not caused petitioners unexpected or undue hardship.

trative orders. The administrator found that the JAC had violated RAAPO by failing to submit accurate reports of hours worked by apprentices, thus preventing the court from evaluating whether nonwhite apprentices had shared in available employment opportunities, and that Local 28 had: (1) failed, in a timely manner, to provide the racial and ethnic data required by the O & J and RAAPO with respect to new members entering the union as a result of its merger with five predominantly white sheet metal locals, (2) failed to serve copies of the O & J and RAAPO on contractors employing Local 28 members, as ordered by the administrator, and (3) submitted inaccurate racial membership records.[13]

The District Court adopted the administrator's findings and once again adjudicated petitioners guilty of civil contempt. The court ordered petitioners to pay for a computerized recordkeeping system to be maintained by outside consultants, but deferred ruling on additional contempt fines pending submission of the administrator's fund proposal. The court subsequently adopted the administrator's proposed Employment, Training, Education, and Recruitment Fund (Fund) to "be used for the purpose of remedying discrimination." App. to Pet. for Cert. A–113—A–114. The Fund was used for a variety of purposes. In order to increase the pool of qualified nonwhite applicants for the apprentice-

---

[13] The administrator's comments revealed that he was more concerned with Local 28's "inability to provide accurate data" than with the specific errors he had discovered. He emphasized that Local 28 had "no formal system to verify the racial and ethnic composition of [its] membership," App. to Pet. for Cert. A–133, and that "[s]uch verification that was done, was done on a totally haphazard basis." *Ibid.* He concluded that "[t]he lack of any proper verification controls confirms . . . that Local 28 has not acted in the affirmative manner contemplated by the court." *Ibid.* More generally, he observed that "[t]he violations found herein cannot be viewed in isolation, rather they must be seen as part of a pattern of disregard for state and federal court orders and as a continuation of conduct which led the court to find defendants in contempt." *Id.*, at A–138.

ship program, the Fund paid for nonwhite union members to serve as liaisons to vocational and technical schools with sheet metal programs, created part-time and summer sheet metal jobs for qualified nonwhite youths, and extended financial assistance to needy apprentices. The Fund also extended counseling and tutorial services to nonwhite apprentices, giving them the benefits that had traditionally been available to white apprentices from family and friends. Finally, in an effort to maximize employment opportunities for all apprentices, the Fund provided financial support to employers otherwise unable to hire a sufficient number of apprentices, as well as matching funds to attract additional funding for job training programs.[14]

The District Court also entered an Amended Affirmative Action Plan and Order (AAAPO) which modified RAAPO in several respects. AAAPO established a 29.23% minority membership goal to be met by August 31, 1987. The new goal was based on the labor pool in the area covered by the newly expanded union. The court abolished the apprenticeship examination, concluding that "the violations that have occurred in the past have been so egregious that a new approach must be taken to solve the apprentice selection problem." *Id.*, at A–112. Apprentices were to be selected by a three-member Board, which would select one minority apprentice for each white apprentice indentured. Finally, to prevent petitioners from underutilizing the apprenticeship program, the JAC was required to assign to Local 28 contractors one apprentice for every four journeymen, unless the contractor obtained a written waiver from respondents.

---

[14] The Fund was to be financed by the $150,000 fine from the first contempt proceeding, plus an additional payment of $0.02 per hour for each hour worked by a journeyman or apprentice. The Fund would remain in existence until the union achieved its nonwhite membership goal, and the District Court determined that the Fund was no longer necessary.

438

Petitioners appealed the District Court's contempt orders, the Fund order, and the order adopting AAAPO.[15] A divided panel of the Court of Appeals affirmed the District Court's contempt findings,[16] except the finding based on adoption of the older workers' provision.[17] *EEOC* v. *Local 638*, 753 F. 2d 1172 (1985). The court concluded that "[p]articularly in light of the determined resistance by Local 28 to all efforts to integrate its membership, . . . the combination of violations found by [the District Court] amply demonstrates the union's foot-dragging egregious noncompliance . . . and adequately supports [its] findings of civil contempt against both Local 28 and the JAC." *Id.*, at 1183. The

---

[15] Petitioners did not appeal the denial of their cross-motion to terminate the O & J and RAAPO. The city cross-appealed from that part of AAAPO establishing a temporary 29.23% nonwhite membership goal, claiming that the percentage should be higher. The Court of Appeals denied the cross-appeal.

[16] With respect to the finding of underutilization of the apprenticeship program, the court noted that the District Court had mistakenly compared the total number of apprentices enrolled during the period before the O & J was entered against the number of new enrollees admitted during the period after entry of the O & J. However, the court found this error inconsequential, since the statistical comparison was "only a small part of the overall evidence showing underutilization of the apprenticeship program." *EEOC* v. *Local 638*, 753 F. 2d 1172, 1180 (1985). The court determined that the District Court's finding of underutilization was supported by strong evidence that despite a need for more apprentices, petitioners refused to advertise the apprenticeship program and thereby help fill the need. See n. 22, *infra*. The court also noted that "[m]any of the uncertainties about underutilization that are urged by defendants are due in large part to the union's noncompliance with the reporting provisions of RAAPO." 753 F. 2d, at 1183.

[17] The court held that plaintiffs had failed to prove that the older workers' provision had either a discriminatory purpose or effect, because although negotiated, it was never actually implemented. The court instructed the District Court on remand to determine the status and effect of the provision. Because adoption of this provision was the only contemptuous conduct that the Contractors' Association had been charged with, the Court of Appeals vacated all contempt relief against the Association.

court also affirmed the District Court's contempt remedies, including the Fund order, and affirmed AAAPO with two modifications: it set aside the requirement that one minority apprentice be indentured for every white apprentice,[18] and clarified the District Court's orders to allow petitioners to implement objective, nondiscriminatory apprentice selection procedures.[19] The court found the 29.23% nonwhite membership goal to be proper in light of Local 28's "long continued and egregious racial discrimination," *id.*, at 1186, and because it "will not unnecessarily trammel the rights of any readily ascertainable group of non-minority individuals." *Id.*, at 1187. The court rejected petitioners' argument that the goal violated Title VII or the Constitution. The court also distinguished AAAPO from the race-conscious order invalidated by this Court in *Firefighters* v. *Stotts*, 467 U. S. 561 (1984), on three grounds: (1) unlike the order in *Stotts*, AAAPO did not conflict with a bona fide seniority plan; (2) the *Stotts* discussion of § 706(g) of Title VII, 42 U. S. C. § 2000e–5(g), applied only to "make whole" relief and did not address the prospective relief contained in AAAPO and the Fund order; and (3) this case, unlike *Stotts*, involved intentional discrimination.

Local 28 and the JAC filed a petition for a writ of certiorari. They present several claims for review: (1) that the District Court relied on incorrect statistical data; (2) that the

---

[18] The court recognized that "temporary hiring ratios may be necessary in order to achieve integration of a work force from which minorities have been unlawfully barred," but cautioned that "such race-conscious ratios are extreme remedies that must be used sparingly and 'carefully tailored to fit the violations found.'" *Id.*, at 1188, quoting *Association Against Discrimination* v. *Bridgeport*, 647 F. 2d 256, 281 (CA2 1981). Noting that petitioners had voluntarily indentured 45% nonwhites since January 1981, the court concluded that a strict 1-to-1 hiring requirement was not needed to insure that a sufficient number of nonwhites were selected for the apprenticeship program.

[19] The EEOC had argued that AAAPO prohibited the use of any new selection procedures until the 29.23% membership goal was reached.

contempt remedies ordered by the District Court were criminal in nature and were imposed without due process; (3) that the appointment of an administrator to supervise membership practices interferes with their right to self-governance; and (4) that the membership goal and Fund are unconstitutional. Principally, however, petitioners, supported by the Solicitor General, maintain that the membership goal and Fund exceed the scope of remedies available under Title VII because they extend race-conscious preferences to individuals who are not the identified victims of petitioners' unlawful discrimination. We granted the petition, 474 U. S. 815 (1985), and now affirm the Court of Appeals.

## II

Petitioners argue that the District Court relied on incorrect statistical evidence in violation of Title VII and of petitioners' right to due process.

## A

Under the O & J and RAAPO, petitioners were directed to attain a 29% nonwhite membership goal by July 1981. This goal was based on the percentage of minorities in the relevant labor pool within New York City. Petitioners argue that because members and applicants for Local 28 membership have always been drawn from areas outside of New York City, the nonwhite membership goal should have accounted for the percentage of minorities in the relevant labor pool in these areas. Although they concede that there is no evidence in the record from which the correct percentage could be derived, they insist that the District Court's figure is erroneous, and that this error was "significant." [20]

---

[20] In their brief, petitioners also suggest that the District Court's 29% membership goal was used to confirm its original finding of discrimination, and was therefore invalid under *Hazelwood School District* v. *United States*, 433 U. S. 299 (1977) (proof of a pattern of discrimination by statistical evidence must be drawn from relevant geographical locations). However, the Court of Appeals recognized that the District Court's finding of

The 29% nonwhite membership goal was established more than a decade ago and was twice affirmed by the Court of Appeals. Petitioners did not seek certiorari from this Court to review either of the Court of Appeals' judgments. Consequently, we do not have before us any issue as to the correctness of the 29% figure. See *Pasadena City Bd. of Education* v. *Spangler,* 427 U. S. 424, 432 (1976). Under AAAPO, petitioners are now obligated to attain a 29.23% nonwhite-membership goal by August 1987. AAAPO adjusted the original 29% membership goal to account for the fact that Local 28's members were now drawn from areas outside of New York City. Thus, even assuming that the original 29% membership goal was erroneous, it would not affect petitioners' existing obligations under AAAPO, or any other issue now before us.[21]

B

Petitioners argue that the District Court also relied on incorrect data in finding that they had underutilized the apprenticeship program. The Court of Appeals recognized this error, see n. 20, *supra,* but affirmed the finding based on

---

liability "did not rely on inferences from racial ratios of population and employment in the area," but rather "was based on direct and overwhelming evidence of purposeful racial discrimination over a period of many years." *EEOC* v. *Local 638,* 565 F. 2d 31, 36, n. 8 (1977). In any event, petitioners conceded at oral argument that they do not "challeng[e] any finding that there was deliberate discrimination." Tr. of Oral Arg. 7.

[21] Petitioners contend that "[i]nasmuch as [they] have now been held in contempt for not achieving the [29% membership] quota, the propriety of the evidence upon which it was derived is relevant." Brief for Petitioners 35–36. In the first place, the District Court expressly stated that petitioners were not held in contempt for failing to attain the 29% membership goal. In any event, a "contempt proceeding does not open to reconsideration the legal or factual basis of the order alleged to have been disobeyed and thus become a retrial of the original controversy." *Maggio* v. *Zeitz,* 333 U. S. 56, 69 (1948); see also *Walker* v. *City of Birmingham,* 388 U. S. 307, 313–314 (1967); *United States* v. *Rylander,* 460 U. S. 752, 756–757 (1983); C. Wright & A. Miller, Federal Practice and Procedure § 2960, pp. 597–598 (1973).

other evidence presented to the District Court.[22]   Petitioners do not explain whether, and if so, why, the Court of Appeals' evaluation of the evidence was incorrect.   Based on our own review of the record, we cannot say that the District Court's resolution of the evidence presented on this issue was clearly erroneous.   Cf. *National Collegiate Athletic Assn.* v. *Board of Regents of Univ. of Okla.*, 468 U. S. 85, 98, n. 15 (1984); *Rogers* v. *Lodge*, 458 U. S. 613, 623 (1982).   Moreover, because petitioners do not challenge three of the findings on which the first contempt order was based, any alleged use of incorrect statistical evidence by the District Court provides no basis for disturbing the contempt citation.   As the Court of Appeals observed, petitioners' "failure to have the apprentices employed is both an independent ground for contempt and a symptom of the effects of defendants' other kinds of contemptuous conduct."   753 F. 2d, at 1183.

### III

The District Court imposed a variety of contempt sanctions in this case, including fines to finance the Fund, a computerized recordkeeping requirement, and attorney's fees and expenses.   Petitioners claim that these sanctions, while ostensibly imposed for civil contempt, are in fact punitive, and were issued without the procedures required for criminal contempt proceedings, see Fed. Rule Crim. Proc. 42(b); 42 U. S. C. § 2000h.   We reject this contention.

---

[22] The court pointed to evidence before the District Court showing that after the O & J was entered: (1) there was a "sharp increase" in the ratio of journeymen to apprentices employed by contractors; (2) the average number of hours worked annually by journeymen "increased dramatically"; (3) the percentage of unemployed apprentices decreased; and (4) the union issued hundreds of temporary work permits, mostly to white journeymen. Based on this evidence, the Court of Appeals concluded that despite the need for more apprentices, Local 28 had deliberately shifted employment opportunities from apprentices to predominantly white journeymen, and had refused to conduct the general publicity campaign required by RAAPO to attract nonwhites to the apprenticeship program.

Criminal contempt sanctions are punitive in nature and are imposed to vindicate the authority of the court. *United States* v. *Mine Workers*, 330 U. S. 258, 302 (1947). On the other hand, sanctions in civil contempt proceedings may be employed "for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained." *Id.*, at 303–304; see also *McComb* v. *Jacksonville Paper Co.*, 336 U. S. 187, 191 (1949); *Penfield Co. of California* v. *SEC*, 330 U. S. 585, 590 (1947); *Nye* v. *United States*, 313 U. S. 33, 42 (1941); *McCrone* v. *United States*, 307 U. S. 61, 64 (1939); 42 U. S. C. § 2000h. Under this standard, the sanctions issued by the District Court were clearly civil in nature.

The District Court determined that petitioners had underutilized the apprenticeship program to the detriment of nonwhites, and that this was one of the factors that had prevented petitioners even from approaching the court-ordered 29% nonwhite membership goal. The Fund—and the fines used to finance it—sought to remedy petitioners' contemptuous conduct by increasing nonwhite membership in the apprenticeship program in a variety of ways. In an attempt to encourage nonwhite interest in the apprenticeship program, petitioners were required to finance recruiting efforts at vocational schools, and to create summer and part-time sheet metal jobs for qualified vocational students. Nonwhite apprentices were provided with tutorial, counseling, and financial support services. In an effort to stimulate employment opportunities for *all* apprentices, the Fund helped subsidize contractors who could not afford to hire one apprentice for every four journeymen, and helped the union secure matching training funds. The court carefully considered "the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired," *Mine Workers, supra*, at 304, and concluded that the Fund was necessary to secure petitioners' compliance with its earlier orders.

Under the terms of the Fund order, petitioners could purge themselves of the contempt by ending their discriminatory practices and by achieving the court-ordered membership goal; they would then be entitled, with the court's approval, to recover any moneys remaining in the Fund. Thus, the sanctions levied by the District Court were clearly designed to coerce compliance with the court's orders, rather than to punish petitioners for their contemptuous conduct.[23]

## IV

Petitioners, joined by the EEOC, argue that the membership goal, the Fund order, and other orders which require petitioners to grant membership preferences to nonwhites are expressly prohibited by § 706(g), 42 U. S. C. § 2000e–5(g), which defines the remedies available under Title VII. Petitioners and the EEOC maintain that § 706(g) authorizes a district court to award preferential relief only to the actual victims of unlawful discrimination.[24] They maintain that the

---

[23] The District Court had also determined that petitioners had failed to comply with the detailed recordkeeping requirements of the O & J and RAAPO. The computerized recordkeeping system was clearly designed to foster petitioners' compliance with these provisions. Finally, the assessment of attorney fees and expenses compensated respondents for costs occasioned by petitioners' contemptuous conduct.

[24] Both petitioners and the EEOC present this challenge from a rather curious position. Petitioners did not seek review in this Court of the 29% membership goal twice approved by the Court of Appeals, even though that goal was similar to the 29.23% goal they now challenge. However, we reject the State's contention that either res judicata or the law of the case prohibits us from now addressing the legality of the membership goal. See *United States* v. *A. S. Kreider Co.*, 313 U. S. 443, 445–446 (1941); *Southern R. Co.* v. *Clift*, 260 U. S. 316, 319 (1922); *Messenger* v. *Anderson*, 225 U. S. 436, 444 (1912); 1B J. Moore, J. Lucas, & T. Currier, Moore's Federal Practice ¶ 0.404 [4.–6], p. 141 (2d ed. 1984).

The EEOC challenges the membership goal and Fund order even though the EEOC has, throughout this litigation, joined the other plaintiffs in asking the courts to order numerical goals, implementing ratios, and timetables. In the complaint, the Government sought the "selection of sufficient apprentices from among qualified non-white applicants to overcome the effects of past discrimination." App. JA–374. In its post-trial memoran-

membership goal and the Fund violate this provision, since they require petitioners to admit to membership, and otherwise to extend benefits to, black and Hispanic individuals who are not the identified victims of unlawful discrimination.[25]   We reject this argument, and hold that § 706(g) does not prohibit a court from ordering, in appropriate circumstances, affirmative race-conscious relief as a remedy for past discrimination.   Specifically, we hold that such relief may be appropriate where an employer or a labor union has engaged in persistent or egregious discrimination, or where necessary to dissipate the lingering effects of pervasive discrimination.

## A

Section 706(g) states:

"If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful

dum, the Government urged the court to "establish a goal of no less than 30 per cent non white membership in Local 28." *Id.*, at JA–277.   To achieve this goal, the Government asked the court to order petitioners to select apprentices based on a 1-to-1 white to nonwhite ratio, and argued that "a reasonable preference in favor of minority persons to remedy past discriminatory injustices is permissable *[sic]*." *Ibid.*

[25] The last sentence of § 706(g) addresses only court orders requiring the "admission or reinstatement of an individual as a member of a union." 42 U. S. C. § 2000e–5(g).   Thus, even under petitioners' reading of § 706(g), that provision would not apply to several of the benefits conferred by the Fund, to wit the tutorial, liaison, counseling, stipend, and loan programs extended to nonwhites.   Moreover, the District Court established the Fund in the exercise of its contempt powers.   Thus, even assuming that petitioners correctly read § 706(g) to limit the remedies a court may impose *for a violation of Title VII*, that provision would not necessarily limit the District Court's authority to order petitioners to implement the Fund. The EEOC, without citing any authority, maintains that "contempt sanctions imposed to enforce Title VII must not themselves violate the statute's policy of providing relief only to the actual victims of discrimination." Brief for EEOC 11.   We need not decide whether § 706(g) restricts a court's contempt powers, since we reject the proposition that § 706(g) always prohibits a court from ordering affirmative race-conscious relief which might incidentally benefit individuals who were not the actual victims of discrimination.

employment practice . . . , the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay . . . , or any other equitable relief as the court deems appropriate . . . . No order of the court shall require the admission or reinstatement of an individual as a member of a union, or the hiring, reinstatement, or promotion of an individual as an employee, or the payment to him of any back pay, if such individual was refused admission, suspended, or expelled, or was refused employment or advancement or was suspended or discharged for any reason other than discrimination of account of race, color, religion, sex, or national origin in violation of . . . this title." 78 Stat. 261, as amended, and as set forth in 42 U. S. C. § 2000e–5(g).

The language of § 706(g) plainly expresses Congress' intent to vest district courts with broad discretion to award "appropriate" equitable relief to remedy unlawful discrimination. *Teamsters* v. *United States*, 431 U. S. 324, 364 (1977); *Franks* v. *Bowman Transportation Co.*, 424 U. S. 747, 771 (1976); *Albemarle Paper Co.* v. *Moody*, 422 U. S. 405, 421 (1975).[26] Nevertheless, petitioners and the EEOC argue

---

[26] Section 706(g) was modeled after § 10(c) of the National Labor Relations Act, 29 U. S. C. § 160(c). See *Franks* v. *Bowman Transportation Co.*, 424 U. S., at 769; *Albemarle Paper Co.* v. *Moody*, 422 U. S., at 419. Principles developed under the National Labor Relations Act "guide, but do not bind, courts tailoring remedies under Title VII." *Ford Motor Co.* v. *EEOC*, 458 U. S. 219, 226, n. 8 (1982). Section 10(c) as we have noted, was intended to give the National Labor Relations Board broad authority to formulate appropriate remedies:

"[I]n the nature of things Congress could not catalogue all the devices and strategems for circumventing the policies of the Act. Nor could it define the whole gamut of remedies to effectuate these policies in an infinite variety of specific situations. Congress met these difficulties by leaving

that the last sentence of § 706(g) prohibits a court from ordering an employer or labor union to take affirmative steps to eliminate discrimination which might incidentally benefit individuals who are not the actual victims of discrimination. This reading twists the plain language of the statute.

The last sentence of § 706(g) prohibits a court from ordering a union to admit an individual who was "refused admission . . . for any reason other than discrimination." It does not, as petitioners and the EEOC suggest, say that a court may order relief only for the actual victims of past discrimination. The sentence on its face addresses only the situation where a plaintiff demonstrates that a union (or an employer) has engaged in unlawful discrimination, but the union can show that a particular individual would have been refused admission even in the absence of discrimination, for example, because that individual was unqualified. In these circumstances, § 706(g) confirms that a court could not order the union to admit the unqualified individual. *Patterson* v. *Greenwood School District 50*, 696 F. 2d 293, 295 (CA4 1982); *EEOC* v. *American Tel. & Tel. Co.*, 556 F. 2d 167, 174–177 (CA3 1977), cert. denied, 438 U. S. 915 (1978); *Day* v. *Mathews*, 174 U. S. App. D. C. 231, 233, 530 F. 2d 1083, 1085 (1976); *King* v. *Laborers' International Union, Local No. 818*, 443 F. 2d 273, 278–279 (CA6 1971). In this case, neither the membership goal nor the Fund order required petitioners to admit to membership individuals who had been refused admission for reasons unrelated to discrimination. Thus, we do not read § 706(g) to prohibit a court from ordering the kind of affirmative relief the District Court awarded in this case.

---

the adaption of means to end to the empiric process of administration." *Phelps Dodge Corp.* v. *NLRB*, 313 U. S. 177, 194 (1941).

See also *Franks, supra,* at 769, n. 29 ("[Section] 706(g) grants . . . broader discretionary powers than those granted the [NLRB under § 10(c)]").

B

The availability of race-conscious affirmative relief under § 706(g) as a remedy for a violation of Title VII also furthers the broad purposes underlying the statute. Congress enacted Title VII based on its determination that racial minorities were subject to pervasive and systematic discrimination in employment. "[I]t was clear to Congress that '[t]he crux of the problem [was] to open employment opportunities for Negroes in occupations which have been traditionally closed to them,' . . . and it was to this problem that Title VII's prohibition against racial discrimination in employment was primarily addressed." *Steelworkers* v. *Weber*, 443 U. S. 193, 203 (1979) (quoting 110 Cong. Rec. 6548 (1964) (remarks of Sen. Humphrey)). Title VII was designed "to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees." *Griggs* v. *Duke Power Co.*, 401 U. S. 424, 429–430 (1971); see *Teamsters, supra*, at 364–365; *Franks, supra*, at 763, 771; *Albemarle Paper, supra*, at 417–418. In order to foster equal employment opportunities, Congress gave the lower courts broad power under § 706(g) to fashion "the most complete relief possible" to remedy past discrimination. *Franks, supra*, at 770; *Albemarle Paper, supra*, at 418.

In most cases, the court need only order the employer or union to cease engaging in discriminatory practices, and award make-whole relief to the individuals victimized by those practices. In some instances, however, it may be necessary to require the employer or union to take affirmative steps to end discrimination effectively to enforce Title VII. Where an employer or union has engaged in particularly longstanding or egregious discrimination, an injunction simply reiterating Title VII's prohibition against discrimination will often prove useless and will only result in endless enforcement litigation. In such cases, requiring recalcitrant

employers or unions to hire and to admit qualified minorities roughly in proportion to the number of qualified minorities in the work force may be the only effective way to ensure the full enjoyment of the rights protected by Title VII. See *e. g., Thompson* v. *Sawyer,* 219 U. S. App. D. C. 393, 430, 678 F. 2d 257, 294 (1982); *Chisholm* v. *United States Postal Service,* 665 F. 2d 482, 499 (CA4 1981); *United States* v. *Lee Way Motor Freight, Inc.,* 625 F. 2d 918, 943–945 (CA10 1979); *United States* v. *City of Chicago,* 549 F. 2d 415, 437 (CA7), cert. denied, 434 U. S. 875 (1977), modified, 663 F. 2d 1354, 1362 (1981) (en banc); *Rios* v. *Enterprise Assn. Steamfitters Local 638,* 501 F. 2d 622, 631–632 (CA2 1974); *NAACP* v. *Allen,* 340 F. Supp. 703 (MD Ala. 1972), aff'd and remanded, 493 F. 2d 614 (CA5), on remand *sub nom. NAACP* v. *Dothard,* 373 F. Supp. 504, 506–507 (MD Ala. 1974) (Johnson, J.); see also Edwards & Zaretsky, Preferential Remedies for Employment Discrimination, 74 Mich. L. Rev. 1, 9 (1976) ("[A] number of courts have held that some form of preferential remedy is the most effective means of enforcing equal employment opportunity when the facts show a long history of discrimination against a protected class").

Further, even where the employer or union formally ceases to engage in discrimination, informal mechanisms may obstruct equal employment opportunities. An employer's reputation for discrimination may discourage minorities from seeking available employment. See *Morrow* v. *Crisler,* 491 F. 2d 1053, 1056 (CA5) (en banc), cert. denied, 419 U. S. 895 (1974); *Carter* v. *Gallagher,* 452 F. 2d 315, 331 (CA8 1971), cert. denied, 406 U. S. 950 (1972); Spiegelman, Court-Ordered Hiring Quotas after Stotts: A Narrative on the Role of the Moralities of the Web and the Ladder in Employment Discrimination Doctrine, 20 Harv. Civ. Rights–Civ. Lib. L. Rev. 339, 388 (1985); see also *Taylor* v. *Jones,* 653 F. 2d 1193, 1203 (CA8 1981) ("[I]n cases where a discriminatory atmosphere has been shown, the more common forms of relief . . . may not be appropriate or adequate"); Edwards &

Zaretsky, *supra*, at 6. In these circumstances, affirmative race-conscious relief may be the only means available "to assure equality of employment opportunities and to eliminate those discriminatory practices and devices which have fostered racially stratified job environments to the disadvantage of minority citizens." *McDonnell Douglas Corp.* v. *Green,* 411 U. S. 792, 800 (1973); see *Teamsters,* 431 U. S., at 348.[27] Affirmative action "promptly operates to change the outward and visible signs of yesterday's racial distinctions and thus, to provide an impetus to the process of dismantling the barriers, psychological or otherwise, erected by past practices." *NAACP* v. *Allen,* 493 F. 2d, at 621.

Finally, a district court may find it necessary to order interim hiring or promotional goals pending the development of nondiscriminatory hiring or promotion procedures. In these cases, the use of numerical goals provides a compromise between two unacceptable alternatives: an outright ban on

---

[27] We have steadfastly recognized that affirmative race-conscious relief may provide an effective means of remedying the effects of past discrimination. See *Wygant* v. *Jackson Board of Education,* 476 U. S. 267, 277 (1986) (opinion of POWELL, J.) ("[T]o eliminate every vestige of racial segregation and discrimination . . . race-conscious remedial action may be necessary"); *id.,* at 301 (MARSHALL, J., dissenting) ("[R]acial distinctions . . . are highly relevant to the one legitimate state objective of eliminating the pernicious vestiges of past discrimination"); *Fullilove* v. *Klutznick,* 448 U. S. 448 (1980) (upholding 10% set aside of federal contract funds for minority businesses); *University of California Regents* v. *Bakke,* 438 U. S. 265 (1978) (state university may consider race as a factor in admissions process); *United Jewish Organizations of Williamsburgh, Inc.* v. *Carey,* 430 U. S. 144 (1977) (reapportionment of voting districts in accordance with specific numerical racial goals permissible under Voting Rights Act of 1965); *McDaniel* v. *Barresi,* 402 U. S. 39 (1971) (school board properly took race into account in redrawing school districts); *Swann* v. *Charlotte-Mecklenburg Board of Education,* 402 U. S. 1 (1971) (court may use mathematical racial ratios as starting point for remedying school segregation); *United States* v. *Montgomery County Board of Education,* 395 U. S. 225 (1969) (court may properly impose flexible racial ratios for faculty and staff).

hiring or promotions, or continued use of a discriminatory selection procedure.

We have previously suggested that courts may utilize certain kinds of racial preferences to remedy past discrimination under Title VII. See *Fullilove* v. *Klutznick*, 448 U. S. 448, 483 (1980) (opinion of BURGER, C. J.) ("Where federal antidiscrimination laws have been violated, an equitable remedy may in the appropriate case include a racial or ethnic factor"); *id.*, at 513 (POWELL, J., concurring) ("The Courts of Appeals have approved temporary hiring remedies insuring that the percentage of minority group workers in a business or governmental agency will be reasonably related to the percentage of minority group members in the relevant population"); *University of California Regents* v. *Bakke*, 438 U. S. 265, 353 (1978) (opinion of BRENNAN, WHITE, MARSHALL, and BLACKMUN, JJ.) ("[T]he Court has required that preferences be given by employers to members of racial minorities as a remedy for past violations of Title VII"). The Courts of Appeals have unanimously agreed that racial preferences may be used, in appropriate cases, to remedy past discrimination under Title VII.[28]

---

[28] *E. g., Pennsylvania* v. *International Union of Operating Engineers*, 770 F. 2d 1068 (CA3 1985), cert. denied, 474 U. S. 1060 (1986); *Paradise* v. *Prescott*, 767 F. 2d 1514, 1527–1530 (CA11 1985); *Vanguards of Cleveland* v. *City of Cleveland*, 753 F. 2d 479, 485–489 (CA6 1985), aff'd *sub nom.* *Firefighters* v. *Cleveland, post,* p. 501; *Smith* v. *Segar*, 238 U. S. App. D. C. 103, 147–148, 738 F. 2d 1249, 1293–1294 (1984), cert. denied, 471 U. S. 1115 (1985); *Williams* v. *City of New Orleans*, 729 F. 2d 1554, 1557 (CA5 1984); *Thompson* v. *Sawyer*, 219 U. S. App. D. C. 393, 429–430, 678 F. 2d 251, 293–294 (1982); *Chisholm* v. *United States Postal Service*, 665 F. 2d 482, 499 (CA4 1981); *Taylor* v. *Jones*, 653 F. 2d 1193, 1203 (CA8 1981); *United States* v. *Lee Way Motor Freight, Inc.*, 625 F. 2d 918, 934–945 (CA10 1979); *Firefighters Institute for Racial Equality* v. *City of St. Louis*, 616 F. 2d 350, 364 (CA8 1980), cert. denied, 452 U. S. 938 (1981); *United States* v. *City of Alexandria*, 614 F. 2d 1358, 1363–1366 (CA5 1980); *EEOC* v. *Contour Chair Lounge Co.*, 596 F. 2d 809, 813–814 (CA8 1979); *Davis* v. *County of Los Angeles*, 566 F. 2d 1334, 1342–1344 (CA9 1977), vacated as moot, 440 U. S. 625 (1979); *EEOC* v. *American Tel. & Tel. Co.*,

452

## C

Despite the fact that the plain language of § 706(g) and the purposes of Title VII suggest the opposite, petitioners and the EEOC maintain that the legislative history indicates that Congress intended that affirmative relief under § 706(g) benefit only the identified victims of past discrimination. To support this contention, petitioners and the EEOC rely principally on statements made throughout the House and Senate debates to the effect that Title VII would not require employers or labor unions to adopt quotas or preferences that would benefit racial minorities.

---

556 F. 2d 167, 174–177 (CA3 1977), cert. denied, 438 U. S. 915 (1978); *United States* v. *City of Chicago,* 549 F. 2d 415, 436–437 (CA7 1977), cert. denied, 434 U. S. 875 (1977), modified, 663 F. 2d 1354, 1362 (CA7 1981) (en banc); *United States* v. *International Union of Elevator Constructors, Local Union No. 5,* 538 F. 2d 1012, 1017–1020 (CA3 1976); *Patterson* v. *American Tobacco Co.,* 535 F. 2d 257, 273 (CA4), cert. denied, 429 U. S. 920 (1976); *Morgan* v. *Kerrigan,* 530 F. 2d 431, 434 (CA1), cert. denied, 426 U. S. 935 (1976); *Boston Chapter, NAACP, Inc.* v. *Beecher,* 504 F. 2d 1017, 1027–1028 (CA1 1974), cert. denied, 421 U. S. 910 (1975); *Rios* v. *Enterprise Assn. Steamfitters Local 638,* 501 F. 2d 622, 629–633 (CA2 1974); *United States* v. *Masonry Contractors Assn. of Memphis, Inc.,* 497 F. 2d 871, 877 (CA6 1974); *United States* v. *Local Union No. 212 International Brotherhood of Electrical Workers,* 472 F. 2d 634, 636 (CA6 1973); *United States* v. *N. L. Industries, Inc.,* 479 F. 2d 354, 377 (CA8 1973); *United States* v. *Wood, Wire and Metal Lathers International Union, Local No. 46,* 471 F. 2d 408, 412–414 (CA2), cert. denied, 412 U. S. 939 (1973); *United States* v. *Ironworkers Local 86,* 443 F. 2d 544, 553–554 (CA9), cert. denied, 404 U. S. 984 (1971); *Local 53, International Assn. of Heat and Frost Insulators and Asbestos Workers* v. *Volger,* 407 F. 2d 1047, 1055 (CA5 1969).

Given the consistent record in the Courts of Appeals, some commentators have concluded that the legality of court-ordered, race-conscious affirmative action under Title VII was "settled." See B. Schlei & P. Grossman, Employment Discrimination Law, ch. 37, p. 1200, and n. 20 (1976); C. Sullivan, M. Zimmer, & R. Richards, Federal Statutory Law of Employment Discrimination § 13.2, p. 815, and n. 11 (1980); Blumrosen, Affirmative Action in Employment After *Weber,* 34 Rutgers L. Rev. 1, 39–41 (1981).

Our examination of the legislative history of Title VII convinces us that, when examined in context, the statements relied upon by petitioners and the EEOC do not indicate that Congress intended to limit relief under § 706(g) to that which benefits only the actual victims of unlawful discrimination. Rather, these statements were intended largely to reassure opponents of the bill that it would not require employers or labor unions to use racial quotas or to grant preferential treatment to racial minorities in order to avoid being charged with unlawful discrimination. See *Weber*, 443 U. S., at 205. The bill's supporters insisted that this would not be the intent and effect of the legislation, and eventually agreed to state this expressly in § 703(j), 42 U. S. C. § 2000e–2(j). Contrary to the arguments made by petitioners and the EEOC, these statements do not suggest that a court may not order preferential relief under § 706(g) when appropriate to remedy past discrimination. Rather, it is clear that the bill's supporters only wished to emphasize that an employer would not violate the statute merely by having a racially imbalanced work force, and, consequently, that a court could not order an employer to adopt racial preferences merely to correct such an imbalance.

1

H. R. 7152, the bill that ultimately became the Civil Rights Act of 1964, was introduced in the House by Representatives on June 20, 1963, and referred to the Committee on the Judiciary. The bill contained no provisions addressed to discrimination in employment, but the Judiciary Committee amended it by adding Title VII. H. R. Rep. No. 914, 88th Cong., 1st Sess., pt. 1, pp. 26–32 (1963). Title VII as reported by the Judiciary Committee included a version of § 706(g), which read, in relevant part: "No order of the court shall require the admission or reinstatement of an individual as a member of a union . . . if such individual was refused admission, suspended, or expelled . . . for *cause*." H. R. Rep. No. 914, *supra*, at 12 (emphasis added). The word "cause"

was deleted from the bill on the House floor and replaced by the language "any reason other than discrimination on account of race, color, religion, or national origin." 110 Cong. Rec. 2567–2571 (1964). Representative Celler, the Chairman of the House Judiciary Committee and the sponsor of this amendment, explained:

> "[T]he purpose of the amendment is to specify cause. Here the court, for example, cannot find any violation of the act which is based on facts other—and I emphasize 'other'—than discrimination on the grounds of race, color, religion, or national origin. The discharge might be based, for example, on incompetence or a morals charge or theft, but the court can only consider charges based on race, color, religion, or national origin. That is the purpose of this amendment." *Id.*, at 2567.

See also *id.*, at 2570 (remarks of Rep. Gill) ("[W]e would not interfere with discharges for ineptness, or drunkeness [*sic*]").

### 2

Even before the Judiciary Committee's bill reached the House floor, opponents charged that Title VII would require that an employer maintain a racially balanced work force. The Minority Report of the Judiciary Committee observed that "the word discrimination is nowhere defined in the bill," and charged that "the administration intends to rely upon its own construction of 'discrimination' as including the lack of racial balance." H. R. Rep. No. 914, at 68, 73.[29] To

---

[29] Much of the debate in the House centered around the extent of the EEOC's enforcement powers. The original House Judiciary Committee bill empowered the EEOC to issue judicially enforceable cease-and-desist orders upon a finding of discrimination. H. R. Rep. No. 914, 88th Cong., 1st Sess., 41 (1963). The Judiciary Committee eventually deleted the EEOC's cease-and-desist powers in favor of allowing the Commission, or aggrieved persons with the Commission's permission, to enforce Title VII through civil court actions. *Ibid.* The Senate deleted the EEOC's power to bring suit, giving the Attorney General the power to institute suit in

demonstrate how the bill would operate in practice, the Report posited a number of hypothetical employment situations, concluding each time that Title VII would compel employers "to 'racially balance' those who work for him *in every job classification* or be in violation of Federal law." *Id.*, at 69 (emphasis in original).[30] In response, Republican proponents of the bill issued a statement emphasizing that the EEOC could not enforce the statute merely to achieve racial balance:

> "[T]he Commission must confine its activities to correcting abuse, not promoting equality with mathematical certainty. In this regard, nothing in the title permits a person to demand employment. Of greater importance, the Commission will only jeopardize its continued existence if it seeks to impose forced racial balance upon employers or labor unions." *Id.*, pt. 2, p. 29.

---

cases where there existed a pattern or practice of discrimination. See 42 U. S. C. § 2000e–6. Power to litigate was restored to the EEOC in 1972. See Equal Employment Opportunity Act of 1972 § 4a, 86 Stat. 103, 104, 42 U. S. C. § 2000e–5.

[30] For illustrative purposes, we include two of these "examples":

"Under the power granted in this bill, if a carpenters' hiring hall, say, had 20 men awaiting call, the first 10 in seniority being white carpenters, the union could be forced to pass them over in favor of carpenters beneath them in seniority, but of the stipulated race. And if the union roster did not contain the names of the carpenters of the race needed to 'racially balance' the job, the union agent must, then, go into the street and recruit members of the stipulated race in sufficient number . . . else his local could be held in violation of Federal law." H. R. Rep. No. 914, at 71.

"Assume two women of separate races apply to [a] firm for the position of stenographer; further assume that the employer for some indefinable reason, prefers one above the other, whether because of personality, superior alertness, intelligence, work history, or general neatness. Assume the employer has learned good things about the character of one and derogatory things about the character of the other which are not subject to proof. If his firm is not 'racially balanced,' [the employer] has no choice, he must employ the person of that race which, by ratio, is next up, even though he is certain in his own mind that the woman he is not allowed to employ would be a superior employee." *Id.*, at 72–73.

When H. R. 7152 actually reached the House floor, Representative Celler attempted to respond to charges that the existence of racial imbalance would constitute "discrimination" under Title VII, or that the EEOC would be authorized to "order the hiring and promotion only of employees of certain races or religious groups." 110 Cong. Rec. 1518 (1964).[31] Nevertheless, accusations similar to those made in the Judiciary Committee's Minority Report were repeatedly raised on the House floor. For example, Representative Alger charged that Title VII would "demand by law, special privileges for Negroes":

> "The Negro represents about 10 percent of the population of the United States and it cannot be said he is being kept from opportunity if he is represented in 10 percent of the working force. Now we are asked to ignore population ratios and force the hiring of Negroes even when it will mean, as in Government, that they are given preferential hiring far beyond the 10 percent of the population they represent." *Id.,* at 1645.

Representative Abernathy raised the scenario of a "union [having] to send out a 'racially' balanced staff of organizers to sign up a crew of 'racially balanced' carpenters, a crew of 'racially balanced' laborers, 'racially balanced' plumbers, electricians, plasterers, roofers, and so forth, before a construction job could begin." *Id.,* at 1620; see also *id.,* at 1633, 2557 (remarks of Rep. Dowdy); *id.,* at 2558 (remarks of Rep. Ashmore); *id.,* at 2571 (remarks of Rep. Gathings). Supporters of the bill stridently denied any intent to require "racial bal-

---

[31] Representative Celler explained that the Commission would have no power "to rectify existing 'racial or religious imbalance' in employment by requiring the hiring of certain people . . . simply because they are of a given race or religion." 110 Cong. Rec. 1518 (1964). He emphasized that "[n]o order could be entered against an employer except by a court," and that "[e]ven then, the court could not order that any preference be given to any particular race, religion or other group, but would be limited to ordering an end to discrimination." *Ibid.*

ancing."[32] Thus, in response to charges that an employer or labor union would be guilty of "discrimination" under Title VII simply because of a racial imbalance in its work force or membership roster, supporters of the bill insisted repeatedly that Title VII would not require employers or unions to implement hiring or promotional quotas in order to achieve racial balance. The question whether there should be any comparable restrictions with respect to a court's use of racial preferences as an appropriate *remedy for past discrimination* under § 706(g) simply did not arise during the House debates.

3

After passing the House by a vote of 290 to 130, the bill ran into equally strong opposition in the Senate. Opponents initially sought to have it sent to the Senate Judiciary Committee, which was hostile to civil rights legislation. The debate on this motion focused on the merits of the bill; many Senators again raised the specter of "racial balancing." Senator Ervin charged that under the substantive provisions of Title VII, "the Commission could . . . tell an employer that he had too few employees . . . and enter an order . . . requiring him to hire more persons, not because the employer thought he needed more persons, but because the Commission wanted to

---

[32] See *id.*, at 1540 (remarks of Rep. Lindsay) (The bill "does not impose quotas or any special privileges of seniority or acceptance. There is nothing whatever in this bill about racial balance as appears so frequently in the minority report of the committee"); *id.*, at 1600 (remarks of Rep. Minish) ("[U]nder title VII . . . no quota system will be set up, no one will be forced to hire incompetent help because of race or religion, and no one will be given a vested right to demand employment for a certain job"); *id.*, at 1994 (remarks of Rep. Healy) ("Opponents of the bill say that it sets up racial quotas for job[s] . . . . The bill does not do that"); *id.*, at 2558 (remarks of Rep. Goodell) ("There is nothing here as a matter of legislative history that would require racial balancing . . . . We are not talking about a union having to balance its membership or an employer having to balance the number of employees. There is no quota involved").

compel him to employ persons of a particular race." 110 Cong. Rec., at 4764. Similarly, Senator Robertson stated:

> "This title suggests that hiring should be done on some percentage basis in order that racial imbalance will be overcome. It is contemplated by this title that the percentage of colored and white population in a community shall be in similar percentages in every business establishment that employs over 25 persons. Thus, if there were 10,000 colored persons in a city and 15,000 whites, an employer with 25 employees would, in order to overcome racial imbalance, be required to have 10 colored personnel and 15 white. And, if by chance that employer had 20 colored employees he would have to fire 10 of them in order to rectify the situation." *Id.*, at 5092.

Senator Humphrey, one of the most vocal proponents of H. R. 7152, rose to the bill's defense. He introduced a newspaper article quoting the answers of a Justice Department expert to common objections to Title VII. In response to the "objection" that "[w]hite people would be fired, to make room for Negroes," the article stated that "[t]he bill would not authorize anyone to order hiring or firing to achieve racial or religious balance." *Id.*, at 5094. Later, responding to a political advertisement suggesting that federal agencies would interpret "discrimination" under Title VII as synonymous with racial imbalance, Senator Humphrey stressed that Title VII "does [not] in any way authorize the Federal Government to prescribe, as the advertisement charges, a 'racial balance' of job classifications or office staffs or 'preferential treatment of minorities'" to achieve such a balance. *Id.*, at 5423. After 17 days of debate, the Senate voted to take up the bill directly without referring it to a committee. *Id.*, at 6417.

Senators Humphrey and Kuchel, who served as bipartisan floor managers for H. R. 7152, opened formal debate on the merits of the bill and addressed opponents' charges that Title

VII would require employers to implement quotas to achieve a certain racial balance. Senator Humphrey stressed that "[c]ontrary to the allegations of some opponents of this title, there is nothing in it that will give any power to the Commission or to any court to require hiring, firing, or promotion of employees in order to meet a racial 'quota' or to achieve a certain racial balance." *Id.*, at 6549. Senator Kuchel elaborated:

"[Title VII] is pictured by its opponents and detractors as an intrusion of numerous Federal inspectors into our economic life. These inspectors would presumably dictate to labor unions and their members with regard to . . . racial balance in job classifications, racial balance in membership, and preferential advancement for members of so called minority groups. Nothing could be further from the truth . . . . [T]he important point . . . is that the court cannot order preferential hiring or promotion consideration for any particular race, religion, or other group." *Id.*, at 6563.

These sentiments were echoed by Senators Case and Clark, who spoke as bipartisan team "captains" in support of Title VII. The Senators submitted an interpretative memorandum which explained that "[t]here is no requirement in title VII that an employer maintain a racial balance in his work force." *Id.*, at 7213. Senator Clark also introduced a Justice Department memorandum which repeated what supporters of the bill had tried to make clear:

"There is no provision, either in title VII or in any other part of this bill, that requires or authorizes any Federal agency or Federal court to require preferential treatment for any individual or any group for the purpose of achieving racial balance. No employer is required to hire an individual because that individual is a Negro. No employer is required to maintain any ratio of Ne-

groes to whites, Jews to gentiles, Italians to English, or women to men." *Id.*, at 7207.

Opponents of the bill invoked a 2-month filibuster, again raising the charge that "discrimination" would be defined to include racial imbalance. Senator Robertson remarked: "What does discrimination mean? If it means what I think it does, and which it could mean, it means that a man could be required to have a quota *or he would be discriminating.*" *Id.*, at 7419 (emphasis added). Senators Smathers and Sparkman conceded that Title VII did not in so many words require the use of quotas, but feared that employers would adopt racial quotas or preferences to avoid being charged with discrimination. *Id.*, at 7800, 8500, 8618–8619. Even outsiders joined in the debate. Senator Javits referred to charges raised by Governor Wallace of Alabama that the bill "vested power in a federal inspector who, under an allegation of racial imbalance . . . can establish a quota system whereby a certain percentage of a certain ethnic group must be employed." *Id.*, at 11471. The bill's supporters insisted that employers would not be required to implement racial quotas to avoid being charged with liability.[33] Nonetheless, opponents remained skeptical.

Recognizing that their own verbal assurances would not end the dispute over "racial balancing," supporters of the bill eventually agreed to insert an explicit disclaimer

---

[33] See *id.*, at 7420 (remarks of Sen. Humphrey) ("[I]f [Senator Robertson] can find in title VII . . . any language which provides that an employer will have to hire on the basis of percentage or quota related to color, race . . . I will start eating the pages"); *id.*, at 8500–8501 (remarks of Sen. Allott) ("[I]f anyone sees in the bill quotas or percentages, he must read that language into it. It is not in the bill"); *id.*, at 8921 (remarks of Sen. Williams) ("[T]here is nothing whatever in the bill which provides for racial balance or quotas in employment"); *id.*, at 11471 (remarks of Sen. Javits) (the bill "in no respect imposes a quota system or racial imbalance standard"); *id.*, at 11848 (remarks of Sen. Humphrey) (the title "does not provide that any quota systems may be established to maintain racial balance in employment").

into the language of the bill to assuage opponents' fears. Senator Dirksen introduced the comprehensive "Dirksen-Mansfield" amendment as a substitute for the entire bill, which added several provisions defining and clarifying the scope of Title VII's substantive provisions. One of those provisions, § 703(j), specifically addressed the charges of "racial balancing":

> "Nothing contained in this subchapter shall be interpreted to require any . . . labor organization, or joint labor-management committee . . . to grant preferential treatment to any individual or to any group because of the race . . . of such individual or group on account of an imbalance which may exist with respect to the total number or percentage of persons of any race [admitted to the labor organization, or to any apprenticeship program] in comparison with the total number or percentage of persons of such race . . . in any community, State, section, or other area, or in the available work force in any community, State, section, or other area." 42 U. S. C. § 2000e–2(j).

As Senator Humphrey explained:

> "A new subsection 703(j) is added to deal with the problem of racial balance among employees. The proponents of this bill have carefully stated on numerous occasions that title VII does not require an employer to achieve any sort of racial balance in his work force by giving preferential treatment to any individual or group. Since doubts have persisted, subsection (j) is added to state this point expressly. This subsection does not represent any change in the substance of the title. It does state clearly and accurately what we have maintained all along about the bill's intent and meaning." 110 Cong. Rec., at 12723.

See also id., at 12618 (remarks of Sen. Muskie) (§ 703(j) "limit[s] the term 'unlawful employment practice' by spelling out

a number of situations that could not be considered unlawful").[34] Section 703(j) apparently calmed the fears of most opponents, for complaints of "racial balance" and "quotas" died down considerably after its adoption.

In contrast to the heated debate over the substantive provisions of § 703, the Senate paid scant attention to the remedial provisions of § 706(g). Several Senators did emphasize, in reference to the last sentence of section 706(g), that "[t]he title does not provide for the reinstatement or employment of a person . . . if he was fired or refused employment or promotion for any reason other than discrimination prohibited by the Title." 110 Cong. Rec., at 11848 (remarks of Sen. Humphrey).[35] While both petitioners and the EEOC liberally quote from these excerpts, we do not read these statements as supporting their argument that a district court may not order affirmative race-conscious relief which may incidentally benefit individuals who are not identified victims of unlawful discrimination. . To the contrary, these statements confirm

---

[34] Even before introduction of the Dirksen-Mansfield substitute bill, Senator Allott proposed an amendment which would preclude courts from finding "an unlawful employment practice . . . solely on the basis of evidence that an imbalance exists with respect to . . . race." *Id.*, at 9881. He explained that his amendment was addressed to charges that Title VII "is intended to require hiring to overcome racial imbalance in the workforce," *ibid.*, and that "an employer will hire members of minority groups, regardless of their qualifications, to avoid having any problems with the [EEOC]." *Ibid.* Senator Allott's amendment was superseded by the Dirksen-Mansfield substitute bill, and was never voted upon.

[35] See *id.*, at 6549 (remarks of Sen. Humphrey) ("No court order can require hiring, reinstatement, admission to membership, or payment of back pay for anyone who was not fired, refused employment or advancement or admission to a union by an act of discrimination forbidden by this title. This is stated expressly in the last sentence of [§ 706(g)], which makes clear what is implicit throughout the whole title; namely, that employers may hire and fire, promote and refuse to promote for any reason, good or bad, provided only that individuals may not be discriminated against because of race, religion, sex, or national origin"); *id.*, at 7214 (Interpretative Memorandum); *id.*, at 14465 (Bipartisan Civil Rights Newsletter No. 28).

our reading of the last sentence of § 706(g): that a court has no power to award relief to an individual who was denied an employment opportunity for reasons other than discrimination.

After 83 days of debate, the Senate adopted Title VII by a vote of 73 to 27. 110 Cong. Rec., at 14511. Rather than setting up a Conference Committee, the House voted directly upon, and passed, the Senate version of the bill. *Id.*, at 15897. The bill's sponsors repeated, for the last time, that Title VII "[did] not require quotas, racial balance, or any of the other things that the opponents have been saying about it." *Id.*, at 15876 (remarks of Rep. Lindsay); see also *id.*, at 15893 (remarks of Rep. MacGregor); *ibid.* (remarks of Rep. McCulloch).

To summarize, many opponents of Title VII argued that an employer could be found guilty of discrimination under the statute simply because of a racial imbalance in his work force, and would be compelled to implement racial "quotas" to avoid being charged with liability. *Weber*, 443 U. S., at 205. At the same time, supporters of the bill insisted that employers would not violate Title VII simply because of racial imbalance, and emphasized that neither the Commission nor the courts could compel employers to adopt quotas solely to facilitate racial balancing. *Id.*, at 207, n. 7. The debate concerning what Title VII did and did not require culminated in the adoption of § 703(j), which stated expressly that the statute did not require an employer or labor union to adopt quotas or preferences simply because of a racial imbalance. However, while Congress strongly opposed the use of quotas or preferences merely to maintain racial balance, it gave no intimation as to whether such measures would be acceptable as *remedies* for Title VII violations.[36]

---

[36] Cf. *Bakke*, 438 U. S., at 342, n. 17 (opinion of BRENNAN, WHITE, MARSHALL, and BLACKMUN, JJ.) ("Even assuming that Title VII prohibits employers from deliberately maintaining a particular racial composition in their work force as an end in itself, this does not imply, in the absence of any consideration of the question, that Congress intended to ban the use of

Congress' failure to consider this issue is not surprising, since there was relatively little civil rights litigation prior to the adoption of the 1964 Civil Rights Act. More importantly, the cases that had been litigated had not resulted in the sort of affirmative-action remedies that, as later became apparent, would sometimes be necessary to eliminate effectively the effects of past discrimination. Thus, the use of racial preferences as a *remedy* for past discrimination simply was not an issue at the time Title VII was being considered. Our task then is to determine whether Congress intended to preclude a district court from ordering affirmative action in appropriate circumstances as a remedy for past discrimination. See *Brooklyn Savings Bank* v. *O'Neil,* 324 U. S. 697, 706 (1945); *Burnet* v. *Guggenheim,* 288 U. S. 280, 285 (1933). Our examination of the legislative policy behind Title VII leads us to conclude that Congress did not intend to prohibit a court from exercising its remedial authority in that way.[37]

racial preferences as a tool for achieving the objective of remedying past discrimination or other compelling ends").

[37] We also reject petitioners' argument that the District Court's remedies contravened § 703(j), since they require petitioners to grant preferential treatment to blacks and Hispanics based on race. Our examination of the legislative history convinces us that § 703(j) was added to Title VII to make clear that an employer or labor union does not engage in "discrimination" simply because of a racial imbalance in its work force or membership, and would not be required to institute preferential quotas to avoid Title VII liability. See *Steelworkers* v. *Weber,* 443 U. S. 193, 205, n. 5 (1979) ("[Section] 703(j) speaks to substantive liability under Title VII"); *Teamsters,* 431 U. S., at 339–340, n. 20 ("[Section] 703(j) makes clear that Title VII imposes no requirement that a work force mirror the general population"); *Franks,* 424 U. S., at 758 ("[T]he . . . provisions of § 703 . . . delineat[e] which employment practices are illegal and thereby prohibited and which are not"). We reject the notion that §703(j) somehow qualifies or proscribes a court's authority to order relief otherwise appropriate under § 706(g) in circumstances where an illegal discriminatory act or practice is established. See *EEOC* v. *American Tel. & Tel. Co.,* 556 F. 2d, at 174; *United States* v. *International Union of Elevator Constructors, Local Union No. 5,* 538 F. 2d, at 1019; *Patterson* v. *American Tobacco Co.,* 535 F. 2d, at 273; *Boston Chapter, NAACP, Inc.,* 504 F. 2d, at 1028; *Rios* v. *Enterprise Assn.*

Congress deliberately gave the district courts broad authority under Title VII to fashion the most complete relief possible to eliminate "the last vestiges of an unfortunate and ignominious page in this country's history," *Albemarle Paper*, 422 U. S., at 418. As we noted above, affirmative race-conscious relief may in some instances be necessary to accomplish this task. In the absence of any indication that Congress intended to limit a district court's remedial authority in a way which would frustrate the court's ability to enforce Title VII's mandate, we decline to fashion such a limitation ourselves.

4

Our reading of the scope of the district court's remedial powers under § 706(g) is confirmed by the contemporaneous interpretations of the EEOC and the Justice Department.[38] Following the enactment of the Civil Rights Act of 1964, both the Justice Department and the EEOC, the two federal agen-

---

*Steamfitters Local 638*, 501 F. 2d, at 631; Blumrosen, 34 Rutgers L. Rev., at 39.

[38] Although the EEOC now makes a contrary argument, we note that the brief for the United States and the EEOC submitted by the Solicitor General in *Weber, supra,* described the 1964 legislative history as follows:

"To be sure, there was considerable concern that the Act would be construed to require the use of quota systems to establish and maintain racial balance in employers' work forces. . . . The sponsors of the bill repeatedly assured its opponents that this was not the intent and would not be the effect of the statute. . . . But these assurances did not suggest restrictions on remedies that could be ordered after a finding of discrimination. Instead, they made it clear that the statute would not impose a duty on employers to establish racially balanced work forces and that it would not require or even permit employers to establish racial quotas for employment in the absence of discrimination of the kind prohibited by the Act. . . ." Brief for United States and EEOC, O. T. 1978, Nos. 78–432, 78–435, and 78–436, pp. 29–30 (citations omitted).

The brief concludes that "the last sentence of Section 706(g) simply state[s] that a court could not order relief under the authority of the Act if employers took action against employees or applicants on grounds other than those prohibited by the Act." *Id.*, at 30–31.

cies charged with enforcing Title VII, steadfastly maintained that race-conscious remedies for unlawful discrimination are available under the statute. Both agencies have, in appropriate cases, sought court orders and consent decrees containing such provisions. See, *e. g., United States* v. *City of Alexandria*, 614 F. 2d 1358 (CA5 1980); *United States* v. *Lee Way Motor Freight, Inc.*, 625 F. 2d 918 (CA10 1979); *EEOC* v. *Contour Chair Lounge Co.*, 596 F. 2d 809 (CA8 1979); *EEOC* v. *American Tel. & Tel. Co.*, 556 F. 2d 167 (CA3 1977); *United States* v. *Masonry Contractors Assn. of Memphis, Inc.*, 497 F. 2d 871 (CA6 1974); *United States* v. *Local Union No. 212 International Brotherhood of Electrical Workers*, 472 F. 2d 634 (CA6 1973); *United States* v. *Wood, Wire and Metal Lathers International Union, Local No. 46*, 471 F. 2d 408 (CA2), cert. denied, 412 U. S. 939 (1973); *United States* v. *Ironworkers Local 86*, 443 F. 2d 544, 548 (CA9), cert. denied, 404 U. S. 984 (1971); see also Affirmative Action Appropriate Under Title VII of the Civil Rights Act of 1964, 29 CFR § 1608 (1985); Uniform Guidelines on Employee Selection Procedures § 1607.17; 42 Op. Atty. Gen. 405 (1969). The agencies' contemporaneous reading of the statute lends strong support to our interpretation. See *Udall* v. *Tallman*, 380 U. S. 1, 16 (1965); *E. I. du Pont de Nemours & Co.* v. *Collins*, 432 U. S. 46, 54–55 (1977).

5

Finally, our interpretation of § 706(g) is confirmed by the legislative history of the Equal Employment Opportunity Act of 1972, 86 Stat. 103, which amended Title VII in several respects. One such change modified the language of § 706(g) to empower a court to order "such affirmative action as may be appropriate, which may include, *but is not limited to* reinstatement or hiring of employees . . . *or any other equitable relief as the court deems appropriate.*" 42 U. S. C. § 2000e–5(g) (emphasized language added in 1972). This language was intended "to give the courts wide discretion ex-

ercising their equitable powers to fashion the most complete relief possible." 118 Cong. Rec. 7168 (1972). While the section-by-section analysis undertaken in the Conference Committee Report stressed the need for "make-whole" relief for the "victims of unlawful discrimination," *id.*, at 7168, 7565, nowhere did Congress suggest that a court lacked the power to award preferential remedies that might benefit non-victims. Indeed, the Senate's rejection of two other amendments supports a contrary conclusion.

During the 1972 debates, Senator Ervin introduced an amendment to counteract the effects of the Department of Labor's so-called Philadelphia Plan. The Philadelphia Plan was established pursuant to Executive Order No. 11246, 3 CFR 339 (1964–1965 Comp.), and required prospective federal contractors to submit affirmative-action programs including "specific goals of minority manpower utilization." *Contractors Assn. of Eastern Pa.* v. *Secretary of Labor*, 442 F. 2d 159, 163 (CA3), cert. denied, 404 U. S. 854 (1971). Attacking the Plan as "[t]he most notorious example of discrimination in reverse," 118 Cong. Rec., at 1663, Senator Ervin proposed an amendment to Title VII that read, in relevant part: "No department, agency, or officer of the United States shall require an employer to practice discrimination in reverse by employing persons of a particular race . . . in either fixed or variable numbers, proportions, percentages, quotas, goals, or ranges." *Id.*, at 1662. Senator Ervin complained that the amendment was needed because both the Department of Labor and the EEOC were ignoring § 703(j)'s prohibition against requiring employers to engage in preferential hiring for racial minorities. *Id.*, at 1663–1664.

Senator Javits vigorously opposed Senator Ervin's proposal. First, he recognized that the amendment, while targeted at the Philadelphia Plan, would also jettison "the whole concept of 'affirmative action' as it has been developed under Executive Order 11246 *and as a remedial concept under*

*Title VII."   Id.,* at 1664 (emphasis added).   He explained that the amendment would "deprive the courts of the opportunity to order affirmative action under title VII of the type which they have sustained in order to correct a history of unjust and illegal discrimination in employment."   *Id.,* at 1665. To emphasize this point, Senator Javits had printed in the Congressional Record both the decision of the Court of Appeals for the Third Circuit sustaining the Philadelphia Plan, and a decision by the Court of Appeals for the Ninth Circuit affirming a District Court's Title VII remedial order requiring a union to indenture a certain percentage of black apprentices and to offer special programs for certain black applicants.   *Id.,* at 1665–1675 (reprinting *Contractors Assn.,* and *Ironworkers Local 86, supra*).[39]   Senator Javits summarized his attack on the Ervin amendment as follows:

> "[I]t would torpedo orders of courts seeking to correct a history of unjust discrimination in employment on racial or color grounds, because it would prevent the court from ordering specific measures which could assign specific percentages of minorities that had to be hired, and that could apply to government as well as private employers."   *Id.,* at 1675.

Senator Williams, referring to Senator Javits' examples of "the kind of situation that could be affected adversely" by Senator Ervin's amendment, argued that the "amendment would strip title VII . . . of all its basic fiber.   It can be read to deprive even the courts of any power to remedy clearly proven cases of discrimination."   *Id.,* at 1676.   The Ervin amendment was defeated by a margin of 2 to 1.   *Ibid.*

---

[39] Senator Javits also referred to the decision in *United States* v. *Enterprise Assn. Steamfitters Local 638,* 337 F. Supp. 217 (SDNY 1972): "I am told, and I believe the information to be reliable, that under the decision made last week by Judge Bonsal in New York, in the Steamfitters case, an affirmative order was actually entered requiring a union local to take in a given number of minority-group apprentices."   118 Cong. Rec. 1665 (1972).

Senator Ervin proposed a second amendment that would have extended § 703(j)'s prohibition against racial preferences to "Executive Order Numbered 11246, or any other law or Executive Order," *id.*, at 4917–4918; this amendment was also defeated resoundingly. *Id.*, at 4918.[40] Thus, the legislative history of the 1972 amendments to Title VII confirms the availability of race-conscious affirmative action as a remedy under the statute. Congress was aware that both the Executive and Judicial Branches had used such measures to remedy past discrimination,[41] and rejected amendments that would have barred such remedies. Instead, Congress reaffirmed the breadth of the court's remedial powers under § 706(g) by adding language authorizing courts to order "any

---

[40] The House considered a bill that would have transferred administration of Executive Order 11246 from the Department of Labor's Office of Federal Contract Compliance (OFCC) to the EEOC. See H. R. 1746, 92d Cong., 1st Sess., § 717(f) (1971); H. R. Rep. No. 92–238, pp. 14–16, 57 (1971). Because the OFCC had required contractors to adopt hiring goals in order to bid on federal projects, opponents feared that the bill would give the EEOC the authority to order racial quotas. Representative Dent proposed an amendment that read: "The Commission shall be prohibited from imposing or requiring a quota or preferential treatment with respect to numbers of employees, or percentage of employees of any race, color, religion, sex, or national origin." 117 Cong. Rec. 31784 (1971). Supporters of this amendment repeated what the 1964 Congress had adamantly insisted upon: that "[s]uch a prohibition against the imposition of quotas or preferential treatment already applies to actions brought under Title VII." *Ibid.* (remarks of Rep. Dent); see *id.*, at 32091 (remarks of Rep. Erlenborn). The bill ultimately passed by the House left the OFCC intact, and the Dent amendment never came to a vote.

[41] In addition to the decisions cited by Senator Javits, other federal courts had, prior to the passage of the 1972 amendments, approved of the use of racial preferences to remedy the effects of illegal employment discrimination. See, *e. g.*, *Carter* v. *Gallagher*, 452 F. 2d 315, 330 (CA8 1971) (en banc), cert. denied, 406 U. S. 950 (1972); *Local 53, International Assn. of Heat and Frost Insulators and Asbestos Workers* v. *Volger*, 407 F. 2d, at 1055; *United States* v. *Central Motor Lines, Inc.*, 338 F. Supp. 532, 560–562 (WDNC 1971); *United States* v. *Sheet Metal Workers International Assn., Local 10*, 3 EPD ¶ 8068 (NJ 1970).

other equitable relief as the court deems appropriate." 42 U. S. C. § 2000e–5(g). The section-by-section analysis undertaken by the Conference Committee Report confirms Congress' resolve to accept prevailing judicial interpretations regarding the scope of Title VII: "[I]n any area where the new law does not address itself, or in any area where a specific contrary intention is not indicated, it was assumed that the present case law as developed by the courts would continue to govern the applicability and construction of Title VII." 118 Cong. Rec., at 7166, 7564. Thus, "[e]xecutive, judicial, and congressional action subsequent to the passage of Title VII conclusively established that the Title did not bar the remedial use of race." *Bakke*, 438 U. S., at 353, n. 28 (opinion of BRENNAN, WHITE, MARSHALL, and BLACKMUN, JJ.); see also *Boston Chapter, NAACP, Inc.* v. *Beecher*, 504 F. 2d 1017, 1027–1028 (CA1 1974), cert. denied, 421 U. S. 910 (1975); *United States* v. *Local No. 212 International Brotherhood of Electrical Workers*, 472 F. 2d, at 636; *United States* v. *International Union of Elevator Constructors, Local Union No. 5*, 538 F. 2d 1012, 1017–1020 (CA3 1976); cf. *North Haven Board of Education* v. *Bell*, 456 U. S. 512, 534–535 (1982); *Lorillard* v. *Pons*, 434 U. S. 575, 580–581 (1978).[42]

---

[42] Again, we note that the brief submitted by the Solicitor General in *Weber* urged this reading of the 1972 legislative history. The Solicitor General argued that "[a]ny doubts that Title VII authorized the use of race-conscious remedies were put to rest with the enactment of the Equal Employment Opportunity Act of 1972." Brief for United States and EEOC, O. T. 1978, Nos. 78–432, 78–435, and 78–436, p. 31. Referring specifically to the amendment to the language of § 706(g), the Government argued:

"In light of Congress's keen awareness of the kinds of remedies courts had been granting in Title VII cases, and in light of the protests from Senator Ervin and others over the use of race-conscious remedies, this amendment to Section 706(g) provides substantial support for the proposition that Congress intended that numerical, race-conscious relief is available under Title VII to remedy employment discrimination." *Id.*, at 35.

## D

Finally, petitioners and the EEOC find support for their reading of § 706(g) in several of our decisions applying that provision. Petitioners refer to several cases for the proposition that court-ordered remedies under § 706(g) are limited to make-whole relief benefiting actual victims of past discrimination. See *Ford Motor Co.* v. *EEOC*, 458 U. S. 219 (1982); *Connecticut* v. *Teal*, 457 U. S. 440 (1982); *Teamsters* v. *United States*, 431 U. S. 324 (1977); *Franks* v. *Bowman Transportation Co.*, 424 U. S. 747 (1976); *Albemarle Paper Co.* v. *Moody*, 422 U. S. 405 (1975). This reliance is misguided. The cases cited hold only that a court may order relief designed to make individual victims of racial discrimination whole. See *Teamsters, supra* (competitive seniority); *Franks, supra,* at 779 (same); *Albemarle Paper, supra,* at 422 (backpay). None of these decisions suggested that individual "make-whole" relief was the *only* kind of remedy available under the statute; on the contrary, several cases emphasized that the district court's remedial powers should be exercised both to eradicate the effects of unlawful discrimination as well as to make the victims of past discrimination whole. *Teamsters, supra,* at 364; *Franks, supra,* at 771; *Albemarle Paper, supra,* at 421. Neither do these cases suggest that § 706(g) prohibits a court from ordering relief which might benefit nonvictims; indeed several cases acknowledged that the district court has broad authority to "devise prospective relief designed to assure that employers found to be in violation of [Title VII] eliminate their discriminatory practices and the effects therefrom." *Teamsters, supra,* at 361, n. 47; see also *Franks, supra,* at 770; *Albemarle Paper, supra,* at 418.

Petitioners claim to find their strongest support in *Firefighters* v. *Stotts*, 467 U. S. 561 (1984). In *Stotts*, the city of Memphis, Tennessee, had entered into a consent decree re-

quiring affirmative steps to increase the proportion of minority employees in its Fire Department. Budgetary cuts subsequently forced the city to lay off employees; under the city's last-hired, first-fired seniority system, many of the black employees who had been hired pursuant to the consent decree would have been laid off first. These employees sought relief, and the District Court, concluding that the proposed layoffs would have a racially discriminatory effect, enjoined the city from applying its seniority policy "insofar as it will decrease the percentage of black[s] that are presently employed." *Id.*, at 567. We held that the District Court exceeded its authority.

First, we rejected the claim that the District Court was merely enforcing the terms of the consent decree since the parties had expressed no intention to depart from the existing seniority system in the event of layoffs. Second, we concluded that the District Court's order conflicted with § 703(h) of Title VII,[43] which "permits the routine application of a seniority system absent proof of an intention to discriminate." *Id.*, at 577. Since the District Court had found that the proposed layoffs were not motivated by a discriminatory purpose, we held that the court erred in enjoining the city from applying its seniority system in making the layoffs.

We also rejected the Court of Appeals' suggestion that the District Court's order was justified by the fact that, had plaintiffs prevailed at trial, the court could have entered an order overriding the city's seniority system. Relying on *Teamsters, supra,* we observed that a court may abridge a bona fide seniority system in fashioning a Title VII remedy only to make victims of intentional discrimination whole, that

---

[43] "Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system . . . provided that such differences are not the result of an intention to discriminate because of race." 42 U. S. C. § 2000e–2(h).

is, a court may award competitive seniority to individuals who show that they had been discriminated against. However, because none of the firefighters protected by the court's order was a proven victim of illegal discrimination, we reasoned that at trial the District Court would have been without authority to override the city's seniority system, and therefore the court could not enter such an order merely to effectuate the purposes of the consent decree.

While not strictly necessary to the result, we went on to comment that "[o]ur ruling in *Teamsters* that a court can award competitive seniority only when the beneficiary of the award has actually been a victim of illegal discrimination is consistent with the policy behind § 706(g)" which, we noted, "is to provide 'make-whole' relief only to those who have been actual victims of illegal discrimination." 467 U. S., at 579–580. Relying on this language, petitioners, joined by the EEOC, argue that both the membership goal and the Fund order contravene the policy behind § 706(g) since they extend preferential relief to individuals who were not the actual victims of illegal discrimination. We think this argument both reads *Stotts* too broadly and ignores the important differences between *Stotts* and this case.

*Stotts* discussed the "policy" behind § 706(g) in order to supplement the holding that the District Court could not have interfered with the city's seniority system in fashioning a Title VII remedy. This "policy" was read to prohibit a court from awarding make-whole relief, such as competitive seniority, backpay, or promotion, to individuals who were denied employment opportunities for reasons unrelated to discrimination. The District Court's injunction was considered to be inconsistent with this "policy" because it was tantamount to an award of make-whole relief (in the form of competitive seniority) to individual black firefighters who had not shown that the proposed layoffs were motivated by racial discrimination. See Note, Race-Conscious Remedies Versus Seniority Systems: *Firefighters Local Union No. 1784* v.

*Stotts*, 30 St. Louis U. L. J. 257, 269 (1985).[44]   However, this limitation on *individual* make-whole relief does not affect a court's authority to order race-conscious affirmative action. The purpose of affirmative action is not to make identified victims whole, but rather to dismantle prior patterns of employment discrimination and to prevent discrimination in the future.   Such relief is provided to the class as a whole rather than to individual members; no individual is entitled to relief, and beneficiaries need not show that they were themselves victims of discrimination.[45]   In this case, neither the membership goal nor the Fund order required petitioners to indenture or train particular individuals, and neither required them to admit to membership individuals who were refused admission for reasons unrelated to discrimination.   We decline petitioners' invitation to read *Stotts* to prohibit a court from ordering any kind of race-conscious affirmative relief that might benefit nonvictims.[46]   This reading would distort

---

[44] We note that, consistent with *Stotts*, the District Court in this case properly limited make-whole relief to the actual victims of discrimination. The court awarded backpay, for example, only to those class members who could establish that they were discriminated against.

[45] Even where the district court orders such relief, we note that § 706(g) protects the right of the employer or the union to exclude a particular individual from its work force or membership for reasons unrelated to discrimination.

[46] The Government urged a different interpretation of *Stotts* earlier in this lawsuit.   In July 1984, petitioners' counsel, in a letter to the Court of Appeals, argued that *Stotts* "affects the propriety [of the remedies ordered] by the district court."   App. 5.   In response, counsel for the EEOC submitted that "the decision in *Stotts* does not affect the disposition of the issues in this appeal."   *Ibid.*   Counsel explained that "the court's discussion [in *Stotts*] of § 706(g) is not relevant to the relief challenged by the appellants since it relates only to the award of retroactive or 'make whole' relief and not to the use of prospective remedies," like those ordered by the District Court.   *Id.*, at 6.   With respect to the last sentence of § 706(g), counsel stated:

"The last sentence of § 706(g) . . . deals with 'make whole' relief and does not even address prospective relief, let alone state that all prospective remedial orders must be limited so that they only benefit the specific vic-

the language of § 706(g), and would deprive the courts of an important means of enforcing Title VII's guarantee of equal employment opportunity.[47]

## E

Although we conclude that § 706(g) does not foreclose a district court from instituting some sorts of racial preferences where necessary to remedy past discrimination, we do not mean to suggest that such relief is always proper. While the fashioning of "appropriate" remedies for a particular Title VII violation invokes the "equitable discretion of the district courts," *Franks*, 424 U. S., at 770, we emphasize that a court's judgment should be guided by sound legal principles. In particular, the court should exercise its discretion with an eye towards Congress' concern that race-conscious affirmative measures not be invoked simply to create a racially balanced work force. In the majority of Title VII cases, the

tims of the employer's or union's past discriminatory acts. Moreover, the language and the legislative history of § 706(g) support the Commission's position that carefully tailored prospective race-conscious measures are permissible Title VII remedies. . . . [T]he fact that this interpretation was consistently followed by the Commission and the Department of Justice, during the years immediately following enactment of Title VII entitles the interpretation to great deference." App. 7–8.

[47] The federal courts have declined to read *Stotts* broadly, and have instead limited the decision to its facts. See *Pennsylvania* v. *International Union of Operating Engineers*, 770 F. 2d 1068 (CA3 1985), cert. denied, 474 U. S. 1060 (1986); *Paradise* v. *Prescott*, 767 F. 2d, at 1527–1530; *Turner* v. *Orr*, 759 F. 2d 817, 823–826 (CA11 1985); *Vanguards of Cleveland* v. *Cleveland*, 753 F. 2d, at 485–489; *Diaz* v. *American Telephone & Telegraph*, 752 F. 2d 1356, 1360, n. 5 (CA9 1985); *Van Aken* v. *Young*, 750 F. 2d 43, 44–45 (CA6 1984); *Wygant* v. *Jackson Bd. of Ed.*, 746 F. 2d 1152, 1157–1159 (CA6 1984), rev'd on other grounds, 476 U. S. 267 (1986); *Kromnick* v. *School Dist. of Philadelphia*, 739 F. 2d 894, 911 (CA3 1984), cert. denied, 469 U. S. 1107 (1985); *Grann* v. *Madison*, 738 F. 2d 786, 795, n. 5 (CA7), cert. denied, 469 U. S. 918 (1984); *Deveraux* v. *Geary*, 596 F. Supp. 1481, 1485–1487 (Mass. 1984), aff'd, 765 F. 2d 268 (CA1 1985); *NAACP* v. *Detroit Police Officers Assn.*, 591 F. Supp. 1194, 1202–1203 (ED Mich. 1984).

court will not have to impose affirmative action as a remedy for past discrimination, but need only order the employer or union to cease engaging in discriminatory practices and award make-whole relief to the individuals victimized by those practices. However, in some cases, affirmative action may be necessary in order effectively to enforce Title VII. As we noted before, a court may have to resort to race-conscious affirmative action when confronted with an employer or labor union that has engaged in persistent or egregious discrimination. Or such relief may be necessary to dissipate the lingering effects of pervasive discrimination. Whether there might be other circumstances that justify the use of court-ordered affirmative action is a matter that we need not decide here. We note only that a court should consider whether affirmative action is necessary to remedy past discrimination in a particular case before imposing such measures, and that the court should also take care to tailor its orders to fit the nature of the violation it seeks to correct.[48] In this case, several factors lead us to conclude that the relief ordered by the District Court was proper.

First, both the District Court and the Court of Appeals agreed that the membership goal and Fund order were necessary to remedy petitioners' pervasive and egregious discrimination. The District Court set the original 29% membership goal upon observing that "[t]he record in both state and federal courts against [petitioners] is replete with instances of their bad faith attempts to prevent or delay affirm-

---

[48] This cautious approach to the use of racial preferences has been followed by the Courts of Appeals. As one commentator has noted:

"While the circuit courts of appeals have indicated that they possess [the] power [to award race-conscious affirmative relief], they have been reluctant to exercise it. The federal appellate courts have preferred to issue less harsh orders such as recruiting and posting of notices of vacancies. They have tended to impose hiring orders only after employer recalcitrance has been demonstrated." Blumrosen, 34 Rutgers L. Rev., at 41.

See also Edwards & Zaretsky, Preferential Remedies for Employment Discrimination, 74 Mich. L. Rev. 1, 6–7 (1975).

ative action." 401 F. Supp., at 488. The court extended the goal after finding petitioners in contempt for refusing to end their discriminatory practices and failing to comply with various provision of RAAPO. In affirming the revised membership goal, the Court of Appeals observed that "[t]his court has twice recognized Local 28's long continued and egregious racial discrimination . . . and Local 28 has presented no facts to indicate that our earlier observations are no longer apposite." 753 F. 2d, at 1186. In light of petitioners' long history of "foot-dragging resistance" to court orders, simply enjoining them from once again engaging in discriminatory practices would clearly have been futile. Rather, the District Court properly determined that affirmative race-conscious measures were necessary to put an end to petitioners' discriminatory ways.

Both the membership goal and Fund order were similarly necessary to combat the lingering effects of past discrimination. In light of the District Court's determination that the union's reputation for discrimination operated to discourage nonwhites from even applying for membership, it is unlikely that an injunction would have been sufficient to extend to nonwhites equal opportunities for employment. Rather, because access to admission, membership, training, and employment in the industry had traditionally been obtained through informal contacts with union members, it was necessary for a substantial number of nonwhite workers to become members of the union in order for the effects of discrimination to cease. The Fund, in particular, was designed to insure that nonwhites would receive the kind of assistance that white apprentices and applicants had traditionally received through informal sources. On the facts of this case, the District Court properly determined that affirmative, race-conscious measures were necessary to assure the equal employment opportunities guaranteed by Title VII.

Second, the District Court's flexible application of the membership goal gives strong indication that it is not being

used simply to achieve and maintain racial balance, but rather as a benchmark against which the court could gauge petitioners' efforts to remedy past discrimination. The court has twice adjusted the deadline for achieving the goal, and has continually approved of changes in the size of the apprenticeship classes to account for the fact that economic conditions prevented petitioners from meeting their membership targets; there is every reason to believe that both the court and the administrator will continue to accommodate *legitimate* explanations for petitioners' failure to comply with the court's orders. Moreover, the District Court expressly disavowed any reliance on petitioners' failure to meet the goal as a basis for the contempt finding, but instead viewed this failure as symptomatic of petitioners' refusal to comply with various subsidiary provisions of RAAPO. In sum, the District Court has implemented the membership goal as a means by which it can measure petitioners' compliance with its orders, rather than as a strict racial quota.[49]

---

[49] Other factors support the finding that the membership goal has not been applied as a strict racial quota. For example, the Court of Appeals has twice struck down provisions requiring petitioners to indenture one nonwhite apprentice for each white apprentice indentured. Petitioners, however, characterize the following comments by the District Court as evidence that the 29.23% membership goal is in reality an inflexible quota:

"Although defendants were given seven years to attain [the 29% membership] goal . . . they have not. Indeed, they have a long way to go. In addition, they consistently have violated numerous court orders that were designed to assist in the achievement of that goal. The court therefore sees no reason to be lenient with defendants, for whatever reason, and orders that the . . . merged locals must reach a nonwhite membership of 29.23% by August 31, 1987. If the goal is not attained by that date, defendants will face fines that will threaten their very existence." App. to Pet. for Cert. A–123.

The District Court's comments express the understandable frustration of a court faced with 15 years of petitioners' deliberate resistance to ending discrimination. We do not view these statements as evidence that the court intends to apply the nonwhite membership goal as an inflexible quota. The record shows that the District Court has been willing to accommodate

Third, both the membership goal and the Fund order are temporary measures. Under AAAPO "[p]referential selection of [union members] will end as soon as the percentage of [minority union members] approximates the percentage of [minorities] in the local labor force." *Weber*, 443 U. S., at 208–209; see *United States* v. *City of Alexandria*, 614 F. 2d, at 1366. Similarly, the Fund is scheduled to terminate when petitioners achieve the membership goal, and the court determines that it is no longer needed to remedy past discrimination. The District Court's orders thus operate "as a temporary tool for remedying past discrimination without attempting to 'maintain' a previously achieved balance." *Weber*, 443 U. S., at 216 (BLACKMUN, J., concurring).

Finally, we think it significant that neither the membership goal nor the Fund order "unnecessarily trammel[s] the interests of white employees." *Id.*, at 208; *Teamsters*, 431 U. S., at 352–353. Petitioners concede that the District Court's orders did not require any member of the union to be laid off, and did not discriminate against *existing* union members. See *Weber, supra,* at 208; see also 30 St. Louis U. L. J., at 264. While whites seeking admission into the union may be denied benefits extended to their nonwhite counterparts, the court's orders do not stand as an absolute bar to such individuals; indeed, a majority of new union members have been white. See *City of Alexandria, supra,* at 1366. Many provisions of the court's orders are race-neutral (for example, the requirement that the JAC assign one apprentice for every four journeyman workers), and petitioners remain free to adopt the provisions of AAAPO and the Fund order for the benefit of white members and applicants.

V

Petitioners also allege that the membership goal and Fund order contravene the equal protection component of the Due

---

*legitimate* reasons for petitioners' failure to comply with court orders, and we have no reason to expect that this will change in the future.

480

Process Clause of the Fifth Amendment because they deny benefits to white individuals based on race. We have consistently recognized that government bodies constitutionally may adopt racial classifications as a remedy for past discrimination. See *Wygant* v. *Jackson Board of Education,* 476 U. S. 267 (1986); *Fullilove* v. *Klutznick,* 448 U. S. 448 (1980); *University of California Regents* v. *Bakke,* 438 U. S. 265 (1978); *Swann* v. *Charlotte-Mecklenburg Board of Education,* 402 U. S. 1 (1971). We have not agreed, however, on the proper test to be applied in analyzing the constitutionality of race-conscious remedial measures. See *Wygant,* 476 U. S., at 274 (opinion of POWELL, J.) (means chosen must be "narrowly tailored" to achieve "compelling government interest"); *id.,* at 284–287 (O'CONNOR, J., concurring in part and concurring in judgment); *id.,* at 301–302 (MARSHALL, J., dissenting); *id.,* at 313 (STEVENS, J., dissenting) (public interest served by racial classification and means pursued must justify adverse effects on the disadvantaged group); *Fullilove,* 448 U. S., at 491 (opinion of BURGER, C. J.) (racial preferences subject to "a most searching examination"); *id.,* at 519 (MARSHALL, J., concurring in judgment) (remedial use of race must be substantially related to achievement of important governmental objectives); *Bakke,* 438 U. S., at 305 (opinion of POWELL, J.) (racial classification must be necessary to accomplishment of substantial state interest); *id.,* at 359 (opinion of BRENNAN, WHITE, MARSHALL and BLACKMUN, JJ.) (remedial use of race must be substantially related to achievement of important governmental objectives). We need not resolve this dispute here, since we conclude that the relief ordered in this case passes even the most rigorous test—it is narrowly tailored to further the Government's compelling interest in remedying past discrimination.

In this case, there is no problem, as there was in *Wygant,* with a proper showing of prior discrimination that would justify the use of remedial racial classifications. Both the District Court and Court of Appeals have repeatedly found

petitioners guilty of egregious violations of Title VII, and have determined that affirmative measures were necessary to remedy their racially discriminatory practices. More importantly, the District Court's orders were properly tailored to accomplish this objective. First, the District Court considered the efficacy of alternative remedies, and concluded that, in light of petitioners' long record of resistance to official efforts to end their discriminatory practices, stronger measures were necessary. See *Fullilove, supra,* at 510 (POWELL, J., concurring); *Arthur* v. *Nyquist,* 712 F. 2d 816, 822 (CA2 1983); *NAACP* v. *Allen,* 493 F. 2d, at 621. The court devised the temporary membership goal and the Fund as tools for remedying past discrimination. More importantly, the District Court's orders will have only a marginal impact on the interests of white workers. See *Wygant,* 476 U. S., at 282–283 (opinion of POWELL, J.); *id.,* at 287 (O'CONNOR, J., concurring in part and concurring in judgment); *id.,* at 295 (WHITE, J., concurring in judgment); *id.,* at 309–310 (MARSHALL, J., dissenting); *id.,* at 317 (STEVENS, J., dissenting). Again, petitioners concede that the District Court's orders did not disadvantage *existing* union members. While white applicants for union membership may be denied certain benefits available to their nonwhite counterparts, the court's orders do not stand as an absolute bar to the admission of such individuals; again, a majority of those entering the union after entry of the court's orders have been white. We therefore conclude that the District Court's orders do not violate the equal protection safeguards of the Constitution.[50]

## VI

Finally, Local 28 challenges the District Court's appointment of an administrator with broad powers to supervise its

---

[50] Petitioners also argue that "the construction of Title VII adopted by the Court of Appeals has the effect of making the Civil Rights Act an unconstitutional bill of attainder, visiting upon white persons the sins of past discrimination by others." Brief for Petitioners 33. We reject this contention as without merit.

compliance with the court's orders as an unjustifiable inter-
ference with its statutory right to self-governance.   See 29
U. S. C. § 401(a).   Preliminarily, we note that while AAAPO
gives the administrator broad powers to oversee petitioners'
membership practices, Local 28 retains complete control over
its other affairs.   Even with respect to membership, the ad-
ministrator's job is to insure that petitioners comply with the
court's orders and admit sufficient numbers of nonwhites; the
administrator does not select the particular individuals that
will be admitted, that task is left to union officials.   In any
event, in light of the difficulties inherent in monitoring com-
pliance with the court's orders, and especially petitioners'
established record of resistance to prior state and federal
court orders designed to end their discriminatory member-
ship practices, appointment of an administrator was well
within the District Court's discretion.   See Fed. Rule Civ.
Proc. 53; *Ruiz* v. *Estelle*, 679 F. 2d 1115, 1160–1163 (CA5
1982), cert. denied, 460 U. S. 1042 (1983); *Gary W.* v. *Louisi-
ana*, 601 F. 2d 240, 244–245 (CA5 1979).   While the adminis-
trator may substantially interfere with petitioners' member-
ship operations, such "interference" is necessary to put an
end to petitioners' discriminatory ways.

## VII

To summarize our holding today, six Members of the Court
agree that a district court may, in appropriate circumstances,
order preferential relief benefiting individuals who are not
the actual victims of discrimination as a remedy for violations
of Title VII, see Parts IV–A through IV–D, *supra* (opinion of
BRENNAN, J., joined by MARSHALL, J., BLACKMUN, J., and
STEVENS, J.); *post*, at 483 (POWELL, J., concurring in part
and concurring in judgment); *post*, at 499 (WHITE, J., dis-
senting), that the District Court did not use incorrect statisti-
cal evidence in establishing petitioners' nonwhite member-
ship goal, see Part II–A, *supra*, that the contempt fines and
Fund order were proper remedies for civil contempt, see

Part III, *supra,* and that the District Court properly appointed an administrator to supervise petitioners' compliance with the court's orders, see Part VI, *supra.* Five Members of the Court agree that in this case, the District Court did not err in evaluating petitioners' utilization of the apprenticeship program, see Part II–B, *supra,* and that the membership goal and the Fund order are not violative of either Title VII or the Constitution, see Parts IV–E, V, *supra* (opinion of BRENNAN, J., joined by MARSHALL, J., BLACKMUN, J., and STEVENS, J.); *post* this page, 486–487, and n. 1 (POWELL, J., concurring in part and concurring in judgment). The judgment of the Court of Appeals is hereby

*Affirmed.*

JUSTICE POWELL, concurring in part and concurring in the judgment.

I join Parts I, II, III, and VI of JUSTICE BRENNAN's opinion. I further agree that § 706(g) does not limit a court in all cases to granting relief only to actual victims of discrimination. I write separately with respect to the issues raised in Parts IV and V to explain why I think the remedy ordered under the circumstances of this case violated neither Title VII nor the Constitution.

I

Petitioners contend that the Fund order and the membership goal imposed by the District Court and upheld by the Court of Appeals are forbidden by § 706(g) because that provision authorizes an award of preferential relief only to the actual victims of unlawful discrimination. The plain language of Title VII does not clearly support a view that all remedies must be limited to benefiting victims. And although the matter is not entirely free from doubt, I am unpersuaded by petitioners' reliance on the legislative history of Title VII. Rather, in cases involving particularly egregious conduct a district court may fairly conclude that an injunction

alone is insufficient to remedy a proven violation of Title VII. This is such a case.

The history of petitioners' contemptuous racial discrimination and their successive attempts to evade all efforts to end that discrimination is well stated in Part I of the Court's opinion. Under these circumstances the District Court acted within the remedial authority granted by § 706(g) in establishing the Fund order and numerical goal at issue in this case. This Court's decision in *Firefighters* v. *Stotts*, 467 U. S. 561 (1984), is not to the contrary. There, the question whether Title VII might *ever* authorize a remedy that benefits those who were not victims of discrimination was not before us, although there is language in the opinion suggesting an answer to that question.

## II

There remains for consideration the question whether the Fund order and membership goal contravene the equal protection component of the Due Process Clause of the Fifth Amendment because they may deny benefits to white individuals based on race. I have recently reiterated what I believe to be the standard for assessing a constitutional challenge to a racial classification:

> " 'Any preference based on racial or ethnic criteria must necessarily receive a most searching examination to make sure that it does not conflict with constitutional guarantees.' *Fullilove* v. *Klutznick*, 448 U. S. 448, 491 (1980) (opinion of BURGER, C. J.). There are two prongs to this examination. First, any racial classification 'must be justified by a compelling governmental interest' *Palmore* v. *Sidoti*, 466 U. S. 429, 432 (1984); see *Loving* v. *Virginia*, 388 U. S. 1, 11 (1967); cf. *Graham* v. *Richardson*, 403 U. S. 365, 375 (1971) (alienage). Second, the means chosen by the State to effectuate its purpose must be 'narrowly tailored to the achievement of that

goal.' *Fullilove, supra,* at 480." *Wygant* v. *Jackson Board of Education,* 476 U. S. 267, 273–274 (1986).

The finding by the District Court and the Court of Appeals that petitioners have engaged in egregious violations of Title VII establishes, without doubt, a compelling governmental interest sufficient to justify the imposition of a racially classified remedy. It would be difficult to find defendants more determined to discriminate against minorities. My inquiry, therefore, focuses on whether the District Court's remedy is "narrowly tailored," see *Wygant, supra,* at 280, n. 6, to the goal of eradicating the discrimination engaged in by petitioners. I believe it is.

The Fund order is supported not only by the governmental interest in eradicating petitioners' discriminatory practices, it also is supported by the societal interest in compliance with the judgments of federal courts. Cf. *United States* v. *Mine Workers,* 330 U. S. 258, 303 (1947). The Fund order was not imposed until *after* petitioners were held in contempt. In requiring the Union to create the Fund, the District Court expressly considered "'the consequent seriousness of the burden' to the defendants." App. to Pet. for Cert. 156, quoting 330 U. S., at 304. Moreover, the focus of the Fund order was to give minorities opportunities that for years had been available informally only to nonminorities. The burden this imposes on nonminorities is slight. Under these circumstances, I have little difficulty concluding that the Fund order was carefully structured to vindicate the compelling governmental interests present in this case.

The percentage goal raises a different question. In *Fullilove* v. *Klutznick,* 448 U. S. 448 (1980), this Court upheld the constitutionality of the "minority business enterprise" provision of the Public Works Employment Act of 1977, which required, absent administrative waiver, that at least 10% of federal funds granted for local public works projects be used by grantees to procure services or supplies from businesses owned by minority group members. In my

concurring opinion, I relied on four factors that had been applied by Courts of Appeals when considering the proper scope of race-conscious hiring remedies. Those factors were: (i) the efficacy of alternative remedies; (ii) the planned duration of the remedy; (iii) the relationship between the percentage of minority workers to be employed and the percentage of minority group members in the relevant population or work force; and (iv) the availability of waiver provisions if the hiring plan could not be met. *Id.*, at 510–511. A final factor of primary importance that I considered in *Fullilove*, as well as in *Wygant*, was "the effect of the [remedy] upon innocent third parties." 448 U. S., at 514. Application of those factors demonstrates that the goal in this case comports with constitutional requirements.

First, it is doubtful, given petitioners' history in this litigation, that the District Court had available to it any other effective remedy. That court, having had the parties before it over a period of time, was in the best position to judge whether an alternative remedy, such as a simple injunction, would have been effective in ending petitioners' discriminatory practices. Here, the court imposed the 29% goal in 1975 only after declaring that "[i]n light of Local 28's and JAC's failure to 'clean house' this court concludes that the imposition of a remedial racial goal . . . is essential to place the defendants in a position of compliance with the 1964 Civil Rights Act." *EEOC* v. *Local 638*, 401 F. Supp. 467, 488 (SDNY 1975).[1] On these facts, it is fair to conclude that ab-

---

[1] In its decision establishing the initial goal, the District Court explained: "The record in both state and federal court against these [union and JAC] defendants is replete with instances of their bad faith attempts to prevent or delay affirmative action. After Justice Markowitz [in his 1964 state-court proceeding] ordered implementation of the Corrected Fifth Draft, with the intent and hope that it would create 'a truly nondiscriminatory union[,]' Local 28 flouted the court's mandate by expending union funds to subsidize special training sessions designed to give union members' friends and relatives a competitive edge in taking the JAC battery. JAC obtained an exemption from state affirmative action regulations directed towards

sent authority to set a goal as a benchmark against which it could measure progress in eliminating discriminatory practices, the District Court may have been powerless to provide an effective remedy. Second, the goal was not imposed as a permanent requirement, but is of limited duration. Third, the goal is directly related to the percentage of nonwhites in the relevant work force.

As a fourth factor, my concurring opinion in *Fullilove* considered whether waiver provisions were available in the event that the hiring goal could not be met. The requirement of a waiver provision or, more generally, of flexibility with respect to the imposition of a numerical goal reflects a recognition that neither the Constitution nor Title VII requires a particular racial balance in the workplace. Indeed, the Constitution forbids such a requirement if imposed for its own sake. *Fullilove, supra,* at 507. "We have recognized, however, that in order to remedy the effects of prior discrimination, it may be necessary to take race into account." *Wygant, supra,* at 280. Thus, a court may not choose a remedy for the purpose of attaining a particular racial balance; rather, remedies properly are confined to the elimination of proven discrimination. A goal is a means, useful in limited circumstances, to assist a court in determining whether discrimination has been eradicated.

The flexible application of the goal requirement in this case demonstrates that it is not a means to achieve racial balance. The contempt order was not imposed for the Union's failure to achieve the goal, but for its failure to take the prescribed steps that would facilitate achieving the goal. Additional

---

the administration of apprentice programs on the ground that its program was operating pursuant to court order; yet Justice Markowitz had specifically provided that all such subsequent regulations, to the extent not inconsistent with his order, were to be incorporated therein and applied to JAC's program. More recently, the defendants unilaterally suspended court-ordered time tables for admission of forty non-whites to the apprentice program pending trial of this action, only completing the admission process under threat of contempt citations." 401 F. Supp., at 488.

flexibility is evidenced by the fact that this goal, originally set to be achieved by 1981, has been twice delayed and is now set for 1987.[2]

It is also important to emphasize that on the record before us, it does not appear that nonminorities will be burdened directly, if at all. Petitioners' counsel conceded at oral argument that imposition of the goal would not require the layoff of nonminority union workers, and that therefore the District Court's order did not disadvantage existing union members. Tr. of Oral Arg. 21. This case is thus distinguishable from *Wygant* where the plurality opinion noted that "layoffs impose the entire burden of achieving racial equality on particular individuals, often resulting in serious disruption of their lives." 476 U. S., at 283. In contrast to the layoff provision in *Wygant*, the goal at issue here is akin to a hiring goal. In *Wygant* the plurality observed:

> "In cases involving valid *hiring* goals, the burden to be borne by individuals is diffused to a considerable extent among society generally. Though hiring goals may burden some innocent individuals, they simply do not impose the same kind of injury that layoffs impose." *Id.*, at 282.[3]

My view that the imposition of flexible goals as a remedy for past discrimination may be permissible under the Con-

[2] The District Court declared that "[i]f the goal is not attained by [August 31, 1987], defendants will face fines that will threaten their very existence." App. to Pet. for Cert. A–123. I agree with the plurality, however, that this statement cannot be taken as evidence that the goal will be applied as an inflexible quota. *Ante*, at 478.

[3] Of course, it is too simplistic to conclude from the combined holdings in *Wygant* and this case that hiring goals withstand constitutional muster whereas layoff goals and fixed quotas do not. There may be cases, for example, where a hiring goal in a particularly specialized area of employment would have the same pernicious effect as the layoff goal in *Wygant*. The proper constitutional inquiry focuses on the effect, if any, and the diffuseness of the burden imposed on innocent nonminorities, not on the label applied to the particular employment plan at issue.

stitution is not an endorsement of their indiscriminate use. Nor do I imply that the adoption of such a goal will always pass constitutional muster.[4]

JUSTICE O'CONNOR, concurring in part and dissenting in part.

I join Parts II–A, III, and VI of the Court's opinion. I would reverse the judgment of the Court of Appeals on statutory grounds insofar as the membership "goal" and the Fund order are concerned, and I would not reach petitioners' constitutional claims. I agree with JUSTICE WHITE, however, that the membership "goal" in this case operates as a rigid racial quota that cannot feasibly be met through good-faith efforts by Local 28. In my view, § 703(j), 42 U. S. C. § 2000e-2(j), and § 706(g), 42 U. S. C. § 2000e-5(g), read together, preclude courts from ordering racial quotas such as this. I therefore dissent from the Court's judgment insofar as it affirms the use of these mandatory quotas.

In *Firefighters* v. *Stotts*, 467 U. S. 561 (1984), the Court interpreted § 706(g) as embodying a policy against court-ordered remedies under Title VII that award racial preferences in employment to individuals who have not been subjected to unlawful discrimination. See *id.*, at 579–583. The dissenting opinion in *Stotts* urged precisely the position advanced by JUSTICE BRENNAN's plurality opinion today—that any such policy extends only to awarding make-whole relief

---

[4] If the record now before us supported the position taken by JUSTICE O'CONNOR, I might well view this case differently. JUSTICE O'CONNOR apparently assumes that the goal can be achieved by August 31, 1987, only if the District Court requires "'the replacement of journeymen by apprentices on a strictly racial basis.'" *Post*, at 498 (quoting *EEOC* v. *Local 638*, 753 F. 2d 1172, 1195 (CA2 1985) (Winter, J., dissenting)). If and when that happens, petitioners will be free to argue that an impermissible quota has been imposed on the union and the JAC. An examination of what *has occurred* in this litigation over the years makes plain that the District Court has not enforced the goal in the rigid manner that concerns JUSTICE O'CONNOR. Based on the record actually before us, I am satisfied that the goal imposed by the District Court is a flexible one.

to particular nonvictims of discrimination, and does not bar classwide racial preferences in certain cases. *Id.*, at 612–614 (BLACKMUN, J., dissenting). The Court unquestionably rejected that view in *Stotts*. Although technically dicta, the discussion of § 706(g) in *Stotts* was an important part of the Court's rationale for the result it reached, and accordingly is entitled to greater weight than the Court gives it today. See *id.*, at 582–583.

It is now clear, however, that a majority of the Court believes that the last sentence of § 706(g) does not in all circumstances prohibit a court in a Title VII employment discrimination case from ordering relief that may confer some racial preferences with regard to employment in favor of nonvictims of discrimination. See *ante*, at 444–475 (opinion of BRENNAN, J.); *ante*, at 483–484 (opinion of POWELL, J.); *post*, at 499 (opinion of WHITE, J.). Even assuming that some forms of race-conscious affirmative relief, such as racial hiring goals, are permissible as remedies for egregious and pervasive violations of Title VII, in my view the membership "goal" and Fund order in this case were impermissible because they operate not as goals but as racial quotas. Such quotas run counter to § 703(j) of Title VII, and are thus impermissible under § 706(g) when that section is read in light of § 703(j), as I believe it should be.

The plurality asserts that § 703(j) in no way "qualifies or proscribes a court's authority to order relief otherwise appropriate under § 706(g) in circumstances where an illegal discriminatory act or practice is established." *Ante*, at 464, n. 37. According to the plurality, § 703(j) merely provides that an employer or union does not engage in unlawful discrimination simply on account of a racial imbalance in its work force or membership, and thus is not required to institute preferential quotas to avoid Title VII liability. Thus, the plurality concedes that § 703(j) is aimed at racial quotas, but interprets it as limiting only the substantive liability of employers and unions, not the remedial powers of courts.

This interpretation of §703(j) is unduly narrow. Section 703(j) provides:

> "*Nothing contained in this title shall be interpreted to require* any employer, employment agency, labor organization, or joint labor-management committee subject to this title to grant preferential treatment to any individual or to any group because of the race, color, religion, sex, or national origin of such individual or group on account of an imbalance which may exist with respect to the total number or percentage of persons of any race, color, religion, sex, or national origin employed by any employer, referred or classified for employment by any employment agency or labor organization, admitted to membership or classified by any labor organization, or admitted to, or employed in, any apprenticeship or other training program, in comparison with the total number or percentage of persons of such race, color, religion, sex, or national origin in any community, State, section, or other area, or in the available work force in any community, State, section, or other area" 78 Stat. 257 (emphasis added).

In *Steelworkers* v. *Weber*, 443 U. S. 193, 205, n. 5 (1979), the Court stated that "Section 703(j) speaks to substantive liability under Title VII." While this is *one* purpose of §703(j), the Court in *Weber* had no occasion to consider whether it was the *exclusive* purpose. In my view, the words "Nothing contained in this title shall be interpreted to require" plainly make §703(j) applicable to the interpretation of *any* provision of Title VII, including §706(g). Therefore, when a court interprets §706(g) as authorizing it to require an employer to adopt a racial quota, that court contravenes §703(j) to the extent that the relief imposed as a purported remedy for a violation of Title VII's substantive provisions in fact operates to require racial preferences "on account of [a racial] imbalance." In addition, since §703(j) by its terms limits the circumstances in which an employer or union may

be required to extend "preferential treatment to any individual *or to any group* because of . . . race," the plurality's distinction between make-whole and classwide relief is plainly ruled out insofar as § 703(j) is concerned.

The plurality's restrictive reading of § 703(j) rests largely on its view of the legislative history, which the plurality claims establishes that Congress simply did not consider the use of racial preferences to remedy past discrimination when it enacted Title VII. According to the plurality, the sole focus of concern over racial quotas involved the scope of substantive liability under Title VII: the fear was that employers or unions would be found liable for violating Title VII merely on account of a racial imbalance. This reading of the legislative history ignores authoritative statements—relied on by the Court in *Stotts*, 467 U. S., at 580–582—addressing the relief courts could order, and making plain that racial *quotas*, at least, were not among the permissible remedies for past discrimination. See, *e. g.*, 110 Cong. Rec. 6549 (1964) ("Contrary to the allegations of some opponents of this title, there is nothing in it that will give any power to the Commission or to any court to require hiring, firing, or promotion of employees in order to meet a racial 'quota' or to achieve a certain racial balance") (Sen. Humphrey); *id.*, at 6566 ("[T]itle VII does not permit the ordering of racial quotas in businesses or unions . . .") (memorandum of Republican House sponsors); *id.*, at 14665 ("Under title VII, not even a court, much less the Commission, could order racial quotas or the hiring, reinstatement, admission to membership or payment of back pay for anyone who is not discriminated against in violation of this title") (statement of Senate sponsors in a bipartisan newsletter delivered to Senators supporting the bill during an attempted filibuster).

The plurality's reading of the legislative history also defies common sense. Legislators who objected to racial quotas obviously did so because of the harm that such quotas would impose on innocent nonminority workers as well as because

of the restriction on employer freedom that would follow from an across-the-board requirement of racial balance in every workplace. Racial quotas would inflict such harms on nonminority workers whether such quotas were imposed directly by federal law in the form of a requirement that every work force be racially balanced, or imposed as part of a court-ordered remedy for an employer's violations of Title VII. The legislative history, fairly read, indicates that such racial quotas are impermissible as a means of enforcing Title VII, and that even racial preferences short of quotas should be used only where clearly necessary if these preferences would benefit nonvictims at the expense of innocent nonminority workers.

At bottom, the plurality recognizes that this is so, although it prefers to cut the congressional rejection of racial quotas loose from any statutory moorings and make this policy simply another factor that should inform the remedial discretion of district courts. Indeed, notwithstanding its claim that § 703(j) is irrelevant to interpretation of § 706(g), the plurality tacitly concedes that racial quotas are improper, and that they are improper by virtue of § 703(j). The plurality says that in considering whether to grant race-conscious affirmative relief "the court should exercise its discretion with an eye towards Congress' concern that race-conscious affirmative measures not be invoked simply to create a racially balanced work force." *Ante*, at 475. Since this is precisely the congressional concern that the plurality locates in § 703(j), the plurality appears to recognize that § 703(j) *is* relevant, after all, to the choice of remedies under § 706(g). Moreover, the plurality indicates that a hiring or membership goal must be applied flexibly in order that the goal not be "used simply to achieve and maintain racial balance, but rather as a benchmark against which the court [can] gauge [an employer's or union's] efforts to remedy past discrimination." *Ante*, at 478. It is fair to infer that the plurality approves the use of the membership goal in this case only because, in

its view, that goal can be characterized as "a means by which [the court] can measure petitioners' compliance with its orders, rather than as a strict racial quota." *Ibid.*

The plurality correctly indicates that, as to any racial goal ordered by a court as a remedy for past discrimination, the employer *always* has a potential defense by virtue of § 706(g) against a claim that it was required to hire a particular employee, to wit, that the employee was not hired for "reasons unrelated to discrimination." *Ante*, at 474, n. 45. Although the plurality gives no clues as to the scope of this defense, it is clear that an employer would remain free to refuse to hire unqualified minority applicants, even if as a result the employer failed to meet a racial hiring goal. Thus, an employer's undoubted freedom to refuse to hire unqualified minority applicants, even in the face of a court-ordered racial hiring goal, operates as one important limitation on the extent of any racially preferential treatment that can result from such a goal.

The plurality offers little guidance as to what separates an impermissible quota from a permissible goal. Reference to benchmarks such as the percentage of minority workers in the relevant labor pool will often be entirely proper in order to *estimate* how an employer's work force would be composed absent past discrimination. But it is completely unrealistic to assume that individuals of each race will gravitate with mathematical exactitude to each employer or union absent unlawful discrimination. That, of course, is why there must be a substantial statistical disparity between the composition of an employer's work force and the relevant labor pool, or the general population, before an intent to discriminate may be inferred from such a disparity. *Teamsters* v. *United States*, 431 U. S. 324, 339–340, and n. 20 (1977). Thus, the use of a rigid quota turns a sensible rule of thumb into an unjustified conclusion about the precise extent to which past discrimination has lingering effects, or into an unjustified prediction about what would happen in the future in the

absence of continuing discrimination. The imposition of a quota is therefore not truly remedial, but rather amounts to a requirement of racial balance, in contravention of § 703(j)'s clear policy against such requirements.

To be consistent with § 703(j), a racial hiring or membership goal must be intended to serve merely as a benchmark for measuring compliance with Title VII and eliminating the lingering effects of past discrimination, rather than as a rigid numerical requirement that must unconditionally be met on pain of sanctions. To hold an employer or union to achievement of a particular percentage of minority employment or membership, and to do so regardless of circumstances such as economic conditions or the number of available qualified minority applicants, is to impose an impermissible quota. By contrast, a permissible goal should require only a good-faith effort on the employer's or union's part to come within a range demarcated by the goal itself.

This understanding of the difference between goals and quotas essentially comports with the definitions jointly adopted by the EEOC and the Departments of Justice and Labor in a 1973 memorandum, and reaffirmed on several occasions since then by the EEOC and the Department of Labor. Memorandum—Permissible Goals and Timetables in State and Local Government Employment Practices (Mar. 23, 1973), reprinted in 2 CCH Employment Practices ¶3776 (1985) (hereinafter Memorandum); see 41 Fed. Reg. 38815 (1976) (EEOC Policy Statement on Affirmative Action Programs for State and Local Government Agencies); *Office of Federal Contract Compliance Programs* v. *Priester Construction Co.*, No. 78–OFCCP–11 (Feb. 22, 1983), summarized in OFCCP Order No. 970a3, reprinted in 2 BNA AACM D:9121 (1983). In the view of these federal agencies, which are charged with responsibility for enforcing equal employment opportunity laws, a quota "would impose a fixed number or percentage which must be attained, or which cannot be exceeded," and would do so "regardless of the number

of potential applicants who meet necessary qualifications."
Memorandum, 2 CCH Employment Practices, at 3856. By
contrast, a goal is "a numerical objective, fixed realistically in
terms of the number of vacancies expected, and the number
of qualified applicants available in the relevant job market."
*Ibid.* An employer's failure to meet a goal despite good-faith
efforts "is not subject to sanction, because [the employer] is
not expected to displace existing employees or to hire un-
needed employees to meet [the] goal." *Ibid.* This under-
standing of the difference between goals and quotas seems to
me workable and far more consistent with the policy underly-
ing § 703(j) and § 706(g) than the plurality's forced distinction
between make-whole relief and classwide relief. If, then,
some racial preferences may be ordered by a court as a rem-
edy for past discrimination even though the beneficiaries may
be nonvictims, I would employ a distinction such as this be-
tween quotas and goals in setting standards to inform use by
district courts of their remedial powers under § 706(g) to
fashion such relief.

If, as the Court holds, Title VII sometimes allows district
courts to employ race-conscious remedies that may result in
racially preferential treatment for nonvictims, it does so only
where such remedies are truly necessary. In fashioning any
such remedy, including racial hiring goals, the court should
exercise caution and "take care to tailor its orders to fit the
nature of the violation it seeks to correct." *Ante,* at 476.
As the plurality suggests, goals should generally be tempo-
rary measures rather than efforts to maintain a previously
achieved racial balance, and should not unnecessarily tram-
mel the interests of nonminority employees. Furthermore,
the use of goals is least likely to be consistent with § 703(j)
where the adverse effects of any racially preferential treat-
ment attributable to the goals will be "concentrated upon a
relatively small, ascertainable group of non-minority per-
sons." *EEOC* v. *Local 638,* 753 F. 2d 1172, 1186 (CA2 1985).
In sum, the creation of racial preferences by courts, even in

the more limited form of goals rather than quotas, must be done sparingly and only where manifestly necessary to remedy violations of Title VII if the policy underlying § 703(j) and § 706(g) is to be honored.

In this case, I agree with JUSTICE WHITE that the membership "goal" established by the District Court's successive orders in this case has been administered and will continue to operate "not just [as] a minority membership goal but also [as] a strict racial quota that the union was required to attain." *Post*, at 499 (dissenting). It is important to realize that the membership "goal" ordered by the District Court goes well beyond a requirement, such as the ones the plurality discusses approvingly, that a union "admit qualified minorities roughly in proportion to the number of qualified minorities in the work force." *Ante*, at 449. The "goal" here requires that the racial composition of Local 28's entire membership mirror that of the relevant labor pool by August 31, 1987, without regard to variables such as the number of qualified minority applicants available or the number of new apprentices needed. The District Court plainly stated that "[i]f the goal is not attained by that date, defendants will face fines that will threaten their very existence." App. to Pet. for Cert. A-123.

I see no reason not to take the District Court's mandatory language at face value, and certainly none is supplied by the plurality's conclusory assertion that "the District Court has been willing to accommodate *legitimate* reasons for petitioners' failure to comply with court orders." *Ante*, at 478–479, n. 49. As Judge Winter persuasively argued in dissent below, the District Court was clearly *not* willing to take due account of the economic conditions that led to a sharp decline in the demand for the union skills involved in this case. Indeed, notwithstanding that petitioners have "voluntarily indentured 45% nonwhites in the apprenticeship classes since January 1981," the District Court ordered the JAC to indenture one nonwhite apprentice for every white apprentice.

753 F. 2d, at 1189. The Court of Appeals set this portion of the District Court's order aside as an abuse of discretion, *ibid.*, but the District Court's willingness to impose such a rigid hiring quota certainly suggests that the District Court intended the membership "goal" to be equally absolute.

It is no answer to these observations that the District Court on two previous occasions postponed the final date for full compliance with the membership goal. At the time of the Court of Appeals' decision, Local 28's membership was approximately 10.8% nonwhite, *id.*, at 1187, and at oral argument counsel for petitioners represented that Local 28's membership of about 3,100 workers is now approximately 15.5% nonwhite. See Tr. of Oral Arg. 13. Absent an enormous expansion in the size of the apprentice program—which would be feasible only if the demand for the services of Local 28's members were dramatically to increase—it is beyond cavil that neither the "voluntary" 45% minority ratio now employed for apprenticeship classes nor the District Court's 1-to-1 order could achieve the 29.23% membership goal by Aug. 31, 1987. Indeed, at oral argument counsel for respondents conceded as much. See *id.*, 31–32.

I do not question that petitioners' past violations of Title VII were egregious, or that in some respects they exhibited inexcusable recalcitrance in the face of the District Court's earlier remedial orders. But the timetable with which petitioners were ordered to comply was quite unrealistic and clearly could not be met by good-faith efforts on petitioners' part. In sum, the membership goal operates as a rigid membership quota, which will in turn spawn a sharp curtailment in the opportunities of nonminorities to be admitted to the apprenticeship program. Indeed, in order for the District Court's timetable to be met, this fixed quota would appear to require "the replacement of journeymen by apprentices on a strictly racial basis." 753 F. 2d, at 1195 (Winter, J., dissenting).

Whether the unequivocal rejection of racial quotas by the Congress that enacted Title VII is said to be expressed in § 706(g), in § 703(j), or in both, a "remedy" such as this membership quota cannot stand. For similar reasons, I believe that the Fund order, which created benefits for minority apprentices that nonminority apprentices were precluded from enjoying, operated as a form of racial quota. Accordingly, I would reverse the judgment of the Court of Appeals on statutory grounds insofar as the membership "goal" and Fund order are concerned, without reaching petitioners' constitutional claims.

JUSTICE WHITE, dissenting.

As the Court observes, the general policy under Title VII is to limit relief for racial discrimination in employment practices to actual victims of the discrimination. But I agree that § 706(g) does not bar relief for nonvictims in all circumstances. Hence, I generally agree with Parts I through III of the Court's opinion and with Parts IV–A through IV–D of the plurality opinion. It may also be that this is one of those unusual cases where nonvictims of discrimination were entitled to a measure of the relief ordered by the District Court and affirmed by the Court of Appeals. But Judge Winter, in dissent below, was correct in concluding that critical parts of the remedy ordered in this case were excessive under § 706(g), absent findings that those benefiting from the relief had been victims of discriminatory practices by the union. As Judge Winter explained and contrary to the Court's views, the cumulative effect of the revised affirmative-action plan and the contempt judgments against the union established not just a minority membership goal but also a strict racial quota that the union was required to attain. We have not heretofore approved this kind of racially discriminatory hiring practice, and I would not do so now. Beyond this, I am convinced, as Judge Winter was, that holding the union in contempt for failing to attain the membership quota during a time of economic doldrums in the construction industry and a

declining demand for the union skills involved in this case was for all practical purposes equivalent to a judicial insistence that the union comply even if it required the displacement of nonminority workers by members of the plaintiff class. The remedy is inequitable in my view, and for this reason I dissent from the judgment affirming the Court of Appeals.

JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE joins, dissenting.

Today, in *Firefighters* v. *Cleveland, post,* p. 501 (REHNQUIST, J., dissenting), I express my belief that § 706(g) forbids a court to order racial preferences that effectively displace nonminorities except to minority individuals who have been the actual victims of a particular employer's racial discrimination. Although the pervasiveness of the racial discrimination practiced by a particular union or employer is likely to increase the number of victims who are entitled to a remedy under the Act, § 706(g) does not allow us to go further than that and sanction the granting of relief to those who were not victims at the expense of innocent nonminority workers injured by racial preferences. I explain that both the language and the legislative history of § 706(g) clearly support this reading of § 706(g), and that this Court stated as much just two Terms ago in *Firefighters* v. *Stotts,* 467 U. S. 561 (1984). Because of this, I would not reach the equal protection question, see *ante,* at 479–481 (opinion of BRENNAN, J.), *ante,* at 484–489 (opinion of POWELL, J.), but would rely solely on § 706(g) to reverse the Court of Appeals' judgment approving the order of class-based relief for petitioners' past discrimination.